**OLIN CORPORATION, Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, et al., Defendants.**

**No. 84 Civ. 1968(TPG).**

United States District Court, S.D. New York.

July 7, 1997.

---

Stephen A. Dvorkin, Anderson, Kill, Olick & Oshinsky, P.C., New York City, for Plaintiff.

John L. Alteri, Jr., O'Melveny & Myers, New York City, for Ins. Co. of North America.

Dale C. Christensen, Jr., Seward & Kissel, New York City, for Hanover Ins. Co.

Marian Hertz, Sheft & Sheft, New York City, for American Home Assurance, Lexington Ins. Co., Nat. Union Fire Ins. Co. of Pittsburgh.

Barry G. Saretsky, Bower & Gardner, New York City, for American Re–Ins. Co., Continental Cas. Co.

Katherine B. Posner, Condon & Forsyth, New York City, for Certain Underwriters at Lloyds, London & Edinburgh Ins. Co. Ltd.

Robert Hammesfahr, Blatt, Hammesfahr & Eaton, Chicago, IL, for London Market Ins. Companies.

Richard H. Gimer, Hopkins & Sutter, Washington, DC, Ronald A. Uitz, Law Offices of Richard H. Gimer, Washington, DC, for Commercial Union Ins. Co.

Donna Hughes, D'Amato & Lynch, New York City, for Employers Ins. of Wausau.

Virginia White–Mahaffey, Steptoe & Johnson, Washington, DC, for Federal Ins. Co.

Thomas G. De Luca, De Luca & Forster, White Plains, NY, for Fireman's Fund Ins. Co.

Lawrence L. Flynn, Gottesman, Wolgel, Secunda, Malamy & Flynn, New York City, for Great American Ins. Co.

Katherine B. Posner, Condon & Forsyth, New York City, Robert Hammesfahr, Blatt, Hammesfahr & Eaton, Chicago, IL, for North River Ins. Co.

Daniel A. Bartoldus, Rivkin, Radler & Kremer, Uniondale, NY, for Allstate Ins. Co.

Charles Witherwax, D'amato & Lynch, New York City, for Wausau Ins. Companies.

### OPINION

GRIESA, Chief Judge.

This is an action by Olin Corporation against various insurance companies. Olin seeks to recover from these companies the costs of environmental clean-ups of various sites where it conducted operations. Olin is the successor to Mathieson Chemical Company and Olin Mathieson Corporation. For purposes of simplicity, reference will be made solely to "Olin."

The action was commenced in 1984. In addition to the sites involved in clean-ups as of that time, other sites have been subject to clean-up costs over the years and have been included in the action. At the same time, claims relating to certain sites have been

resolved by motion or settlement. By now, a net total of about 100 sites remain to be dealt with in the action.

The court has just completed the first actual trial in the action, relating to the Williamston, North Carolina site. This opinion deals with that trial.

### Nature of this Opinion

The trial that has been held will obviously not resolve all the claims in this action as to all the parties. Only one of many sites is being dealt with, and Olin is making a claim against only one of the several insurance company defendants.

It is the intention of the court to bring to final disposition all the issues relating to the Williamston site. In addition, there are certain issues which are being fully litigated, which turn out (to some extent unexpectedly) to have little or no bearing upon the Williamston matter, but which are believed to relate in a broad way to many other sites. The court intends to decide those general issues which have been litigated.

The court intends to enter a judgment under Fed.R.Civ.P. 54(b), which provides in pertinent part:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

A partial judgment, embodying the rulings to be made by the court at this juncture is proper under the rule and will enable the parties to take an immediate appeal from these rulings. This will assist in the ultimate resolution of this large lawsuit.

Certain of the issues about the Williamston site were submitted to a jury. Following the jury verdict additional evidence was taken on issues reserved to the court, and the court has received briefing and heard oral argument. The present opinion will deal with most of the issues to be decided by the court.

However, it appears that limited additional proceedings are necessary, particularly on the issues of general application which the court intends to decide. Therefore, prior to the entry of the Rule 54(b) judgment, those additional proceedings will be held and a second opinion will be issued.

### BASIC FACTS

#### The Williamston Operation

At Williamston, Olin acquired a fertilizer plant on the Roanoke River in 1950. In that same year, Olin expanded the operation to include production of dry pesticides. In 1952 the production of liquid pesticides was added. Pesticide components were not manufactured at Williamston, but were procured elsewhere and were combined or "formulated" at the Williamston plant.

Olin continued the production at Williamston until November 1967. From November 1967 to November 1968, the facility was leased to Columbia Nitrogen. The facility was then sold to Kerr–McGee. Kerr–McGee ceased operations at the facility in about 1975. The exact nature of the activities carried out by Columbia Nitrogen and Kerr–McGee is not important, except that the formulation and production of both dry and liquid pesticides entirely ceased with the departure of Olin.

#### The Insurance

Although Olin has named various insurance companies as defendants in the overall lawsuit, only one of these companies has been involved in the trial relating to the Williamston site. This company is the Insurance Company of North America ("INA"). INA was Olin's primary general liability insurer for the period January 1, 1956 through December 31, 1973. The INA insurance covered both personal injury and property damage. The issues relating to Williamston involve only the property damage phase of the insurance. In this respect, the insurance provided the standard coverage for accidental injury to property. Intentional injury to property was not covered. Although the phraseology of the policy language changed at some point, the essential nature of the

coverage for accidental injury to property did not change.

The form of policy which was in effect from 1956 through 1968 provided:

> ... THE COMPANY does hereby agree ...:

> . . . .

> To indemnify the insured for all sums which the insured shall become obligated to pay by reason of the liability imposed upon the insured by law ... for damages because of injury to ... property ... caused by accident.

The form of policy which was in effect from 1969–1973 provided:

> INA will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as a result of ... property damage to which this insurance applies, caused by an occurrence. . . .

> . . . .

> OCCURRENCE—"occurrence," as respects ... Property Damage Liability, means an accident, including injurious exposure to conditions, which results, during the policy period, in property damage neither expected nor intended from the standpoint of the Insured;

The policy which was issued in 1956 was renewed each year through 1968. The policy which was issued in 1969 was renewed each year through 1973. Each form of policy for the years at issue (there is no claim of coverage for 1972 and 1973 for reasons to be explained) provided for a limit of $300,000 on account of each accident or occurrence, and a deductible of $100,000 for each accident or occurrence.

*The Clean-up Orders*

In 1985, about 16 years after Olin left the facility and all pesticide formulation operations ceased, the State of North Carolina received a complaint about odors at the site. At this time a new owner was having country music programs in buildings formerly used in the pesticide operation. The State took some preliminary soil samples and found contamination. This led to the involvement of the U.S. Environmental Protection Agency ("EPA"). The EPA issued an order on Sep-

tember 22, 1986 pursuant to Section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9606(a). This and subsequent EPA directives set in motion work by Olin (1) to remove contaminated soil, (2) to have this contaminated soil transported to approved landfills, and (3) to replace the removed soil with clean soil.

The contamination of soil resulted from Olin's pesticide operation rather than fertilizer. At one relatively small location there was contaminated soil due to the handling of petroleum products by Kerr–McGee. Kerr–McGee reimbursed Olin for the clean-up of this location.

Following the original EPA order in 1986, there were further orders issued by the EPA in 1987 and 1990.

Olin's soil clean-up project started in 1988. It continued for a time during that year and then broke off until 1990, when it resumed and was completed in November 1990. During the hiatus it was decided that the demolition of the buildings formerly used for the production and storage of pesticides was necessary because these buildings were themselves seriously contaminated. This demolition was part of the 1990 work. For purposes of simplicity the references to "soil clean-up" in this opinion will include the building demolition. The EPA issued Olin a "sign-off" letter in November 1991 certifying that the requirements of the EPA had been met.

The total cost to Olin of the soil clean-up conducted pursuant to the EPA directions was about $3.7 million, after reimbursement by Kerr–McGee of its relatively small share.

At some point, a well located at the site, which had been used during the time of the Olin operation, was damaged by the clean-up work. Olin wrote the State of North Carolina in December 1990 advising the State of this situation and indicating the possibility of contamination of drinking water in the area—*i.e.*, contamination of water which was drawn by wells in the area. On June 25, 1991 the State of North Carolina issued an order to Olin and another order to an entity which succeeded Kerr–McGee. The order to

Olin recited that sampling from the damaged on-site well indicated contamination by pesticide components, in violation of North Carolina standards respecting groundwater. The order directed Olin to identify and eliminate the source of groundwater contamination.

It was eventually ascertained that the damaged on-site well posed no threat to the area's drinking water, and that the contamination in that well had been caused by the soil removal work. However, pursuant to the directive of the State of North Carolina, Olin installed a number of monitoring wells on the site commencing in late 1991 and started sampling groundwater from these wells in January 1992. The degree to which contamination of groundwater was found in the monitoring wells will be discussed in some detail later in this opinion. For the present, it is sufficient to say that no contamination was found in groundwater at the level of the wells in this area used for drinking water and other human uses—*i.e.*, about 370–400 feet. However, some contamination was found in "surficial" groundwater. This surficial groundwater starts at the water table, which, in this area, averages about 4 or 5 feet below ground surface. The surficial ground water runs from the water table to a depth of about 15–20 feet.

During the work carried out under the directive of the State of North Carolina Olin hired two consultants. One of these was Geraghty & Miller, Inc. of Raleigh, North Carolina. The other was Rust Environment & Infrastructure of Greenville South Carolina (known as SEC Donohue, Inc. during some of the relevant time). These consultants participated in the taking and analyzing of the groundwater samples, and rendered reports setting forth the results of the tests and also making certain comments about the source of the surficial groundwater contamination. In regard to the latter point, the consultants concluded that the soil removal and replacement carried out by Olin for the EPA had essentially removed the source of the groundwater contamination.

Ultimately Olin requested that it be required to do no work pursuant to the State of North Carolina directive aside from the con-tinuation of testing, and that the alleviation of any groundwater contamination be left to "natural attenuation." In effect, this meant that, with the source of the groundwater contamination gone, and with the surficial groundwater having its natural flow into the Roanoke River, the groundwater would be left to take care of itself.

On May 7, 1996 the State of North Carolina issued a letter approving this plan. Monitoring was to be carried out thereafter on a reduced basis, and indeed continues to this day.

Olin has spent about $400,000 dollars complying with the requirements of the State of North Carolina. Basically no work was done aside from installing the monitoring wells, taking samples and analyzing the results.

*The Issues for Trial*

Olin claims that it should be indemnified by INA for the $3.7 million dollars spent on the soil clean-up during the EPA phase, and for the $400,000 spent on groundwater work during the State of North Carolina phase. Olin further argues that the soil clean-up must be considered as having had a dual result, both in removing contaminated soil, and in removing the source of groundwater contamination.

The range of questions to be resolved were divided into those submitted to the jury and those reserved for the court.

Most of the questions submitted to the jury related, in one way or another, to issues about injury to soil and injury to groundwater. It should be noted here that the INA insurance policies contain exclusions about property owned by the insured. It was agreed that the effect of the owned property exclusions would be decided by the court. The jury was apprised of this and was told that they should assume, so that their deliberations would make sense to them, that the State of North Carolina had a sufficient interest in both the soil and the groundwater, for purposes of protecting the environment, so that the owned property exclusions would not apply.

The jury was asked whether there was injury to property during the years 1951–

1955 which was a cause of clean-up costs incurred by Olin. INA did not insure Olin for the years 1951–1955 and Olin is not making any claim against INA or against any insurance company for these years. For reasons to be explained, it was necessary to obtain an answer to this question because of the possible need to apportion part of the costs to Olin. The jury answered this question in the affirmative. It is agreed that this answer of the jury is properly interpreted as referring to soil only, and not to groundwater.

The jury then answered a series of questions relating to the years during which Olin was insured by INA. This period started in 1956. It concluded at the end of 1973. However, both sides agree that there was a "pollution exclusion" applicable in 1972 and 1973. An issue was submitted to the jury about whether there was also a pollution exclusion in effect for the year 1971. In view of these circumstances, the series of questions about injury to property during the period of INA coverage related to the period from 1956 through 1971. The jury found, by agreement of both parties, that there was injury to soil during the years 1956 through 1971. However, the jury found that the injury to soil was accidental only for the years 1956 and 1957. As noted earlier, the INA coverage was for *accidental* injury only. The jury found that there was injury to groundwater commencing in the year 1958 and running through the year 1971, and that this injury was accidental during all those years.

■ It is worth describing at this point the law regarding the meaning of the concept of accidental injury in connection with liability insurance policies. The parties agree that New York law applies. An accident is contrasted with something intended, an accident being unintended. An unintended act resulting in an unintended injury is clearly accidental injury. However, an intended act resulting in an unintended injury is also an accidental injury. *McGroarty v. Great American Insurance Co.*, 36 N.Y.2d 358, 363–65, 368 N.Y.S.2d 485, 489–91, 329 N.E.2d 172, 174–76 (1975).

In the present case, the chain of causation was as follows. Olin regularly released, over the years, a certain amount of dry pesticide components and liquid pesticide components onto the soil. For instance, dry materials spilled and fell through the floor; liquid materials spilled and fell through the floor; liquid mixing vats were washed and drained onto the ground. It was known to a certainty, even according to Olin's witnesses, that all of this was bound to happen, at least after the plant had been operating for a period of time. Thus the jury found that the contamination of the soil was not accidental, (was intended) commencing in 1958. The jury was, of course, making an estimation as to timing, but it was a reasonable estimation in light of the evidence at the trial.

Over time, pesticide components which reach the surface of the soil may "leach" down into the soil, aided by chemical solvents or rainwater, and may reach a level where the contaminants in the soil come into contact with the groundwater. The surficial groundwater, at least in the area involved in this case, is said to flow at a rate of 680 feet per year. Thus, the contamination of groundwater involves groundwater flowing through contaminated soil, picking up some amount of contamination and flowing on. The jury's decision regarding groundwater meant that there was surficial contamination of groundwater by contaminated soil, beginning in 1958. The jury further found that, although the injury to soil beginning in 1958 was knowing and intended, the consequent injury to the groundwater was unintended. Thus, the injury to groundwater was accidental within the meaning of *McGroarty, supra.*

■ Explanation is in order as to why the jury was asked questions about injury to property occurring after Olin ceased its Williamston operation in 1967. It is the law that insurance coverage of the kind involved here can be "triggered" in any year or year when injury occurs, even though the act causing the injury occurs in prior years. *See Stonewall Insurance Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178, 1194–96 (2d Cir.1995). Although the Olin operation ceased in November 1967, Olin's insurance with INA continued to be renewed for a time, and it was relevant to determine whether injury to property occurred subsequent to

the termination of Olin's activity, resulting from that activity.

■ A further pertinent legal doctrine is that if there is a continuing, gradual injury occurring over many years, the resulting damages may need to be apportioned pro rata over those years among different insurance companies or among insurance companies *and the insured,* if the latter is self-insured during some of the time. *See Stonewall,* 73 F.3d at 1201–05. In the present trial, there is only one insurance company involved, so there is no need of apportionment among insurers. However, Olin agrees, for purposes of this trial, that it is to be considered as a self-insurer for the years 1951–1955.

There are also issues about whether Olin was a self-insurer for the years 1971 through 1985, the last year before the 1986 EPA order.

It should be noted at this point that the jury found that a pollution exclusion was in effect in the INA insurance for 1971. The parties agreed that there was such an exclusion in the INA insurance for 1972 and 1973. But then there is the question of whether, for the years 1971–1973, Olin chose to be a insurer with regard to pollution claims because it could have purchased pollution coverage from another insurance company and failed to do so.

For the years 1974–1985, Olin obtained insurance from companies other than INA, all of which had pollution exclusions. The question, again, is whether Olin nevertheless chose to be a self-insurer because pollution insurance was available from *some* insurers but Olin did not purchase it. Finally, there is the question of whether, even if Olin was forced by pollution exclusions in the years 1971–1985 to do without pollution coverage in the liability insurance it purchased during those years, it could still have purchased insurance in the mid-1980s which would retroactively have covered pollution claims going back to 1971. Arguably, the failure to purchase the latter kind of coverage would make Olin a self-insurer for the years 1971–1985.

It was agreed by the parties that these questions about whether Olin was or was not a self-insurer for pollution claims for the years 1971–1985 would be reserved to the court. However, the jury was asked questions about injury to property relating to those years. The jury found, as already described, that in the year 1971 there was non-accidental injury to soil and accidental injury to groundwater. The jury was also asked to find whether there was injury to property in the years 1972–1985. The jury found in the affirmative for all those years. Since there was no INA policy language to deal with, the questions about the years 1972–1985 did not differentiate between kinds of property or between accidental and non-accidental.

Two final questions were posed to the jury. The jury was asked whether the EPA imposed its clean-up orders upon Olin on account of a threat to humans and wildlife from contaminated soil, or a threat that contaminated soil would injure groundwater, or both. The jury answered that it was both. The jury was also asked whether the costs of removing contaminated soil and buildings from the Williamston site were required to remedy damage to groundwater. The jury answered in the affirmative.

The latter question and answer require some explanation. The question resulted from a considerable amount of discussion between the parties and the court. It was agreed that this form of question would be posed to the jury. However, it was recognized that the question of damages was being left to the court. It was further recognized that, in resolving the issue of damages, it might appear that, while *some* of the soil clean-up costs were required to remedy groundwater damage, not *all* of the soil clean-up costs were required for this purpose. It was decided that any such apportionment should be decided by the court and not by the jury. This, of course, was not the cleanest or most logical procedure, but it was the way it was agreed to be done.

*Issues for the Court*

■ Although the jury answered the questions about injury to property and related

questions, as described above, the jury was not asked to determine what liability and damages, if any, flowed from the property injury found by the jury. This was left to be determined by the court.

The insurance policies do not automatically require INA to make indemnity simply because Olin incurred costs to remedy soil injury or to remedy groundwater injury. Referring to the language of the policies quoted earlier, the question under the both forms of policy is whether Olin has incurred legal liability for damages (sums of money) on account of accidental injury to property. It is the task of the court to resolve this question, taking as the starting point the jury's answers to the questions about injury to property.

The great bulk ($3.7 million) of the costs incurred by Olin related to soil clean-up under the EPA direction. But the jury found *accidental* injury to soil for only the first two of the fifteen years of the INA insurance, and it is only accidental injury which is covered. This finding obviously threatens Olin with being indemnified for only a small part of its costs.

To deal with this problem, Olin has turned to the theory that the soil clean-up costs were incurred not merely to remedy the condition of the soil, but also to remove the source of groundwater contamination. Since the jury found that injury to groundwater was accidental, and was thus a covered injury under the policies, this theory would, in Olin's view, allow recovery against INA, not only of the $400,000 spent on groundwater testing at the direction of the State of North Carolina, but also of the $3.7 million expended in the soil clean-up at the direction of the EPA.

This theory must be tested against the terms of the insurance coverage. The question under the policies, raised by Olin's theory, is whether Olin was held legally liable to pay the $3.7 million soil clean-up cost on account of the groundwater injury.

In dealing with the question of legal liability within the meaning of the insurance policies, the obvious fact must be kept in mind that the present case does not involve liability created by a standard lawsuit in which a plaintiff claimed that he was injured by Olin and sued to recover damages. There was no such lawsuit, nor was there any finding of liability in the usual sense by a jury or judge, nor was there any judgment for damages based upon such a finding. Also, there was no settlement of a lawsuit. To the extent that there was legal liability for damages in the present case, it consisted of compliance by Olin with the directives of the EPA and the State of North Carolina, and expenditure of money by Olin in connection with such compliance. In order to fit the circumstances of the present case into the framework of the insurance, one must answer the following questions: What was it that Olin was liable to the EPA *for?* What was it that Olin was liable to the State of North Carolina *for?*

*Liability to the EPA*

The EPA's original 1986 order contained a finding of soil contamination by pesticide components based on certain preliminary sampling taken by the State of North Carolina. The order further recited that a new public water supply well was proposed to be constructed 200 yards from the site of the former Olin operation, and that this site was located 100 yards from the Roanoke River and lay in its floodplain. The order directed the removal of all contaminated soil in areas where waste was spilled and/or dumped on the property and the disposal of such soil at an approved facility. The order also directed that Olin should install and sample monitoring wells in appropriate locations to identify the extent of groundwater contamination and to assure that the contamination was not migrating from the property. Aside from this monitoring and sampling, no work was ordered regarding groundwater.

A second order was issued by the EPA on August 7, 1987. It was essentially the same as the 1986 order. The direction about sampling groundwater was slightly expanded to provide for the use of the old Olin well or, if testing from this well was not adequate, the installation of an additional well.

As it turned out, the old well was not relied upon. A new monitoring well was installed in September 1987 (now referred to

as "MW–10"). It was located between the site of the former Olin pesticide operation and the proposed town well. MW–10 was sampled in early October, 1987. The sampling demonstrated that there was no contamination of groundwater moving from the former Olin site in the direction of the town water supply.

At that point, the EPA effectively dropped its claim regarding groundwater. The record shows that the soil clean-up, which commenced in 1988 and was under continual on-site direction by the EPA, was carried out to eliminate contaminated soil, without any reference to groundwater. There were three areas of soil removal. The largest—amounting to about 1 1/2 acres—was in the area of the former pesticide plants and warehouse. There were two other, much smaller, areas of soil removal—one where some metal drums had been buried in connection with the pesticide operation, and the other where there was petroleum contamination which had been caused by Kerr–McGee. These areas are illustrated in Appendix A to this opinion. Aside from MW–10, no monitoring wells were installed during the EPA process, except for three temporary wells installed in the petroleum excavation area in 1990. There is little or no evidence about what was found in the latter wells, and there is no evidence of any action taken by the EPA as a result of any tests in those wells. In any event, they had no relation to Olin.

As shown in Appendix A, MW–10 was not installed in any of the soil removal areas. The EPA requested no monitoring wells to be installed in either the 1 1/2 acre soil removal area, or the small area where the drums had been buried.

There are various documents authored by Olin personnel during the time of the work for the EPA expressing the conclusion that, following the testing at MW–10, there was no groundwater issue.

On March 13, 1990 the EPA issued a new order. The apparent purpose of this order was to reactivate the soil clean-up, which had been suspended since 1988. In addition to providing more detailed directions for soil work than had been contained in the prior orders, the March 1990 order directed the

dismantling of the buildings formerly used to produce and store pesticides. The order also recited that the 1987 order had directed the sampling of groundwater. However, no direction as to further groundwater work was contained in the March 1990 order. However, another test at MW–10 was made in 1990, leading to the same conclusion as arrived at previously, that pesticides were not moving in groundwater towards the town water supply.

On November 13, 1991 the EPA wrote Olin stating that the removal action conducted by Olin had complied with the EPA orders and that no further action was required. The letter enclosed a report prepared by an EPA Technical Assistance Team ("TAT") documenting the EPA oversight of the removal action.

The TAT report is a valuable and detailed description of the work done by Olin at the direction of the EPA. One phase of the report which is of particular interest deals with certain excavations which went below the water table and penetrated into the surficial groundwater. The report states:

> The last areas to be excavated were the ditch that runs along the south end of the site, and the large hole in front of the Liquid Blending building. These two areas were the most difficult to remediate because high concentrations of pesticides in those areas carried the excavation below the level of groundwater. The ditch was excavated, sampled and backfilled in sections to prevent groundwater from re-entering the area. During excavation of the large hole, contaminated material was removed beyond the level of groundwater into a layer of substrate consisting mainly of sand. At this point, groundwater was entering from the bottom and sides of the hole, spreading the contaminated material in the hole back over the areas (of the hole) which were determined to be clean by the on-site lab.

The report goes on in considerable technical detail about what was done to deal with the conditions described above. Essentially, the report shows that the effort regarding the groundwater was simply to get rid of it,

so that the soil excavation could be completed and replacement with clean soil could be carried out.

The groundwater entering the hole was found to be contaminated, although no such express finding appears to have been made as to the ditch. An attempt was made to drain the groundwater from the hole to the river by constructing a new ditch leading off from the hole. This was apparently unsuccessful. What was ultimately done was described in the report as follows:

> Originally, water which collected on-site was sprayed directly back in the excavation area to cut down on dust. When groundwater was reached during excavation, the quantity was too great to spray back on-site, and was thus collected in a 50,000 gallon pool. The water was sent through carbon and sand filters, prior to discharge onto the clean backfilled areas, at levels determined by the EPA to represent no additional threat due to any residual contamination. . . .

The material left out at the end of this quotation consists of a reference to an "Appendix B" to the TAT report. Appendix B is not in evidence. The old ditch referred to in the report was a little over 200 feet long. It is not clear from the TAT report how much of the ditch was excavated below the water table. However, the "Rust Report," later rendered by Rust Environment & Infrastructure, indicates quite clearly that the portion of the ditch referred to in the TAT report consisted of a segment of about 100 feet immediately south of the former liquid blending building, and thus immediately south of the deep hole.

The encounter with the groundwater in the hole and the ditch did not lead the EPA to embark upon a program of groundwater testing or cleanup. The EPA field note of August 28, 1990 records a discussion between the EPA representative and others at the scene when they were observing the groundwater seeping into the deep hole. The EPA representative made clear that, although Olin might wish to sample groundwater and embark on a groundwater project if necessary, this "would not be considered a priority at this time . . . and would not be covered under this (the current EPA) order."

On October 16, 1990, S.G. Morrow, who was the main Olin representative at the clean-up operation, wrote a memorandum, which summarized a recent conversation which he had with Art Smith, the EPA representative at the site. The memorandum stated:

> I also discussed Art's comment from the last site visit, about possible groundwater contamination in the "pond" area since we were so deep and still not clean. This is not Art's area since he is only Emergency Removal. Art felt if he involved the EPA remediation people, it could take forever to get anything resolved. He thought it would be better to work with the State of NC people to see if there is a problem. Art does not want to amend the Order, but to finish the project as it now stands. After we are finished, he suggested we meet with him, someone from the State, and Olin at the site. I replied that this sounds like a reasonable approach.

This memorandum confirms that both the EPA and Olin considered that the project being carried out had to do with soil and not groundwater, and that groundwater was a separate subject. There were, of course, two activities during the EPA proceedings which related to groundwater. These were the installation and testing of NW–10, and also the steps taken to purify the groundwater which was collected from the hole and the ditch in the last stages of the work. Olin has not sought to isolate the apparently minor costs of these operations.

It is now necessary to return to the question of insurance coverage, and specifically to the question of what was the subject of Olin's liability to the EPA. It would be a departure from reality and the evidence to say that the liability which Olin incurred to the EPA was on account of injury to groundwater or that the costs of the clean-up carried out for the EPA constituted damages which Olin became obligated to pay because of injury to groundwater.

The jury correctly found that the EPA imposed its clean-up orders upon Olin on account of *both* a threat to humans and wild

life from contaminated soil, and a threat that contaminated soil would injure groundwater. But the jury was not asked to find, and did not find, exactly what actions were taken and what costs were incurred for these purposes. The evidence shows the answer to this latter question. The EPA's concern about groundwater was whether contaminated groundwater was moving from the Olin site in the direction of the town and the town well. After the drilling of one monitoring well (MW–10), it was determined that such movement was not taking place. The EPA gave no other consideration whatever to the groundwater issue until, at the very end of the project, it was necessary to get rid of some contaminated groundwater which was flowing into one or two of the final excavation locations. But the EPA expressly stated that these circumstances were not causing that agency to embark on a groundwater project. The EPA placed no monitoring wells in the soil removal areas.

The inevitable conclusion is that the EPA required Olin to engage in the $3.7 million project for the purpose of ridding the site of contaminated soil *as soil*, not as part of a groundwater investigation or clean-up. Olin's liability to the EPA was for the clean-up of soil. There was no liability to the EPA based on groundwater.

*Liability to the State of North Carolina*

Earlier in this opinion, reference was made to the old well which had been used during the time of the Olin operation, and to the fact that it was damaged during the soil clean-up work. Water in this well was tested and found to be contaminated by pesticide components. As described earlier, in December 1990 (after all the soil clean-up work had been completed), Olin notified the State of North Carolina of this situation, which led to the State's June 25, 1991 order initiating the program of groundwater testing. The EPA was also notified of the problem with the old well. The possible groundwater contamination problem indicated by testing of this well is referred to at the very end of the TAT Report. The conclusion of the EPA TAT report is as follows:

CONCLUSION

Olin is presently coordinating a site investigation with the North Carolina Department of Environment, Health, and Natural Resources to determine the extent of groundwater contamination. However, the tasks outlined in the Administrative Orders issued in September of 1986 and March of 1990, have been completed. With the review of this information EPA will decide whether or not further actions are warranted at this site.

This conclusion to the TAT Report suggested that the EPA would be coordinating with the State of North Carolina in connection with the State's groundwater project. There is, in fact, no evidence that the EPA worked with the State of North Carolina following the time of the State's June 1991 order. The evidence is that the EPA retired from the scene and let the State do what it desired to do with respect to groundwater.

The facts regarding what Olin did under the directive of the State are relatively simple and have been described earlier. Olin installed a number of monitoring wells. The water from these wells has been periodically sampled. Varying degrees of groundwater contamination have been found. The State consented to natural attenuation. Olin has spent about $400,000 complying with the requirements of the State.

It is necessary to return to Olin's theory that it is entitled to be indemnified for the $3.7 million soil clean-up costs because the soil clean-up removed the source of the groundwater contamination. But it is necessary to examine what was done in the State of North Carolina phase of the case, and to determine, as was done respecting the EPA, what was the subject of Olin's liability to the State. What was it that Olin was liable to the State for? The liability of Olin to the State of North Carolina was surely with respect to groundwater, but it was liability solely to carry out the State's directives to install and test monitoring wells, and finally to allow natural attenuation. The State issued no direction to Olin, and imposed no liability upon Olin, for soil clean-up.

Olin contends that it is highly artificial and unrealistic to view the EPA activity and the

State activity separately for the sake of determining what can be recovered against INA. Olin contends that the directives imposed by both the EPA and the State should be viewed as a unit or as a continuum. Olin argues that its liability for the cost of the soil clean-up was imposed during the combined governmental clean-up effort, and that the soil clean-up in fact related equally to soil as soil and to soil as the source of groundwater contamination. This argument needs to be analyzed in steps.

Olin has presented a highly detailed argument based on the trial evidence, including expert opinion adduced at trial, to the effect that the entire cost of soil clean-up was necessary to remove the source of groundwater contamination. But the issue is not how the lawyers and the court in 1997 analyze what they consider to be the groundwater problem, and analyze what they believe was necessary to remove the source of the problem perceived by them. The issue is what were the liabilities which were imposed in the regulatory proceedings brought by the EPA and the State of North Carolina.

The EPA proceeding has been described in detail. Some further discussion of the State proceeding is in order. The State's order of June 1991 required Olin to identify and eliminate the source of groundwater contamination. In compliance with this direction, Olin installed a monitoring well at the spot near the former liquid blending building where the heaviest and deepest concentration of soil contaminants had been found. This was the location of the hole referred to earlier. This well was 15 feet deep and is referred to as "MW–1." Near MW–1 a deeper monitoring well was installed, to a depth of 60 or 70 feet. This is referred to as "DMW–1." MW–1 penetrated into the initial sandy soil stratum lying just below the surface. DMW–1 penetrated through this stratum and through a clay layer. The locations of MW–1 and DMW–1 are shown in Appendix A.

As can been seen in Appendix A, no other monitoring wells were placed in the main 1 1/2 acre soil removal location, which was the area of the former pesticide facility. For instance, no monitoring well was installed at the site of the former dry blending building or the former liquid blending building or the

pesticide warehouse. No monitoring well was installed in the large space through which the ditch ran. There was not even a monitoring well placed in the ditch itself.

MW–9 was installed near the metal excavation area, where the drums had been found. MW–3 and DMW–3 were installed in the area where petroleum contaminants had been found. The remaining monitoring wells were placed on the periphery of the former Olin site. These peripheral wells were not located in any soil removal area and were obviously installed to determine the extent of contaminated groundwater flow from the soil removal areas. The locations of all these wells are shown in Appendix A. A total of 15 MW's, having depths of 15 to 20 feet, were installed, and a total of 4 DMW's were installed with depths of 60 to 70 feet.

There are detailed records showing the results of water samplings from all these wells on various dates from January 7, 1992 until March 25, 1997. The measurements are in parts per billion. The amount of contamination found in the water taken from MW–1 was vastly greater than at any other monitoring well. For instance, on January 7, 1992 the amount of d-BHC (a pesticide component) found at MW–1 was 398 parts per billion. The comparable reading at MW–2 was 2.1 parts per billion; MW–7 37 parts per billion; MW–8 12 parts per billion; MW–9 1.2 parts per billion; MW–10 less than .055 parts per billion.

The test of DMW–1 showed some degree of pesticide contamination, but it was later concluded that this contamination resulted from the installation of the well. The DMW's in fact showed that no contamination had flowed from the surficial aquifer through the clay layer.

Geraghty & Miller rendered a report in November 1992 and Rust rendered a report in May 1994. The Geraghty & Miller Report stated that the MW–1/DMW–1 and MW–3/DMW–3 wells were installed "to quantify constituent concentrations near the source areas." The former pair of wells was at the location of the deep hole near the liquid blending building and the latter pair of wells was at the petroleum site. Only the former

was of concern to Olin and is now relevant to the issues now being discussed. The statement by Geraghty & Miller confirms what is obvious from the evidence as a whole—*i.e.*, that the spot near the liquid blending building was regarded as the source of pesticide contamination of groundwater because of the extremely strong concentration of pesticides in the soil at that point and the depth of those pesticides, going well down below the average water table. This was the location of the deeply excavated hole.

The Rust Report also confirmed that the MW–1 location was the source of the pesticide contamination of groundwater, and remarked on the flow of the groundwater from MW–1 to the three monitoring wells in the direction of the Roanoke River which were not under any former pesticide production facility but which showed some small degree of groundwater contamination. These were MW–2, 5, 7 and 8.

The Geraghty & Miller Report and the Rust Report both reach basically the same conclusions. They conclude that there was some degree of groundwater contamination from pesticides, but that it had not migrated vertically below the surficial aquifer and had not migrated horizontally off the former Olin site, except into the Roanoke River. They further concluded that the source of the pesticide contamination in the groundwater had been removed by virtue of the removal of the contaminated soil at the source of the groundwater contamination, and that there was no danger to human health from the existing contaminated groundwater, since it is not flowing toward any human "receptors." The amount of contaminants flowing into the Roanoke River was not sufficient to harm the river.

As described earlier, the State of North Carolina ultimately decided to allow the remaining groundwater contamination problem to be handled by natural attenuation, and confirmed this decision in its letter of May 7, 1996.

Based on these circumstances, it is necessary to answer the question about whether Olin incurred its $3.7 million soil clean-up costs on account of liability arising from injury to the groundwater. It is the view of the court that this question cannot be divorced from consideration of what each agency directed. The evidence and arguments in this case show no basis for any obligation by Olin to engage in testing or clean-up activities, of the kind carried out, except at the behest of a governmental body. No one in this action is suggesting that the liability referred to in the insurance policies relates to some abstract duty to obey a law. The legal liabilities arose exclusively from the directives of the EPA and the State of North Carolina. We are then left with the unavoidable fact that the EPA imposed the requirement of the soil clean-up, but did not do this in a way which can possibly be construed as making Olin liable for groundwater injury to the EPA. The State of North Carolina imposed liability for groundwater work, but this work did not involve soil clean-up. It is true that the June 1991 order of the State directed that the source of groundwater contamination must be identified and eliminated. However, the "damages" to the State of North Carolina for the elimination of the source of groundwater contamination turned out to be nothing, because that source had already been eliminated.

Olin contends, of course, that since it was the prior soil clean-up which constituted the elimination of the groundwater contamination source, it must be said that Olin's soil clean-up was the subject of both its liability for injured soil and its liability for injured groundwater.

It is undeniable that Olin's consultants in the North Carolina phase relied heavily in their analysis and recommendations upon the fact that the source of groundwater contamination had been eliminated by the soil removal. It can be assumed that this was a factor relied upon by the State in allowing natural attenuation, although there is no express finding to this effect by the State. However, this is something considerably different from having the State of North Carolina itself order the removal of soil. Aside from the legal proposition that there was no *liability* for something the State did not order or require, certain factual problems are presented.

There is no reason whatever to believe, on the basis of the available evidence, that the State would have ordered the removal of the entire body of soil covering the 1 1/2 acre area, as all being a source of groundwater contamination. There is no reason to believe that the State would have ordered the removal of the soil in the drum area as a source of groundwater contamination. The fact is that we do not know what would have been done if the State had been the one to direct specific steps to eliminate the source of groundwater contamination. It cannot be assumed that the State, in the interests of groundwater, would have replicated the EPA, which was interested in the soil.

The court concludes that Olin did not incur the costs of soil removal because of liability on account of injured groundwater.

Even if Olin were to be allowed to recover for soil removal as related to groundwater, there is no basis for Olin receiving the entire $3.7 million.

The record developed at the time, consisting of the consultants' reports, made it clear that the soil at the location of the deep hole near the former liquid blending building—the location of MW–1—was regarded as the source of the groundwater contamination.

An expert witness called by INA made a careful analysis showing that the removal of soil in the vicinity of this highly polluted location near the former liquid blending building would have involved a concave excavation, with an area of 8,000 square feet at the surface and a maximum depth of 10 feet. This would have involved a portion of the $3.7 million cost amounting to $834,000.

It should be noted that INA has presented certain other theories about why it is not required to indemnify Olin for the cost of soil removal, except as related to 1956 and 1957. In view of the rulings of the court announced above, the court does not believe it is necessary to deal with these other theories.

*Deductibility*

■ As earlier described, where there is a continuing, gradual injury occurring over many years, the resulting damages may need to be apportioned over those years for the sake of determining insurance coverage. In the present case, it is agreed that whatever total amount of indemnity is to be recovered from INA on account of injury to soil or on account of injury to groundwater, must be apportioned pro rata over some appropriate number of years. This is because it is impossible to know precisely what amount of injury occurred in any given year. It is further agreed that the $300,000 per occurrence limit will be treated as a yearly limit. This is a practical approach, although not a literal application of the insurance terms. Thus, for any year involved in the apportionment, the policy limit will be $300,000, and the total amounts apportioned to that year will not exceed the limit if they do not exceed the $300,000.

This brings us to the question of the deductible.

Olin argues that, although it can potentially recover $300,000 for many years—*i.e.,* multiples of $300,000—nevertheless there should be only one deductible of $100,000. Olin relies upon *PECO Energy Co. v. Boden*, 64 F.3d 852 (3d Cir.1995).

The court does not agree with Olin's position and does not believe that *PECO Energy* is in point. Under the policies, a $100,000 deductible is applicable to every insured occurrence, and the insurance limit per occurrence is $300,000. The agreement in this case in effect takes each year as an occurrence. The only proper way to construe the insurance provisions is to apply a deductible of $100,000 for each year.

*Categorical Waiver of Notice*

■ The INA insurance polices have standard provisions requiring notice. INA has now withdrawn its claim of failure of proper notice with regard to the Williamston site.

However, it did originally pose such a defense.

At that time Olin responded (1) that there was proper notice, and (2) that as of 1984, INA had acted in such a way as to categorically waive, from that time on, its right to receive notice of accidents, occurrences, and claims on the Olin environmental clean-up problems relating to the various sites.

INA has since withdrawn its defense of lack of proper notice as to Williamston. However, the parties had already presented evidence and arguments about the categorical waiver issue. Moreover, this is an issue of broad significance with respect to many sites at issue in the present action. Consequently, it is appropriate to rule now on the categorical waiver question.

Olin relies on case law to the effect that where an insured has several claims or potential claims, a general disclaimer of liability on all such claims by an insurer can relieve the insured of the obligation to give notice. *See H.S. Equities, Inc. v. Hartford Accident and Indemnity Co.*, 661 F.2d 264, 270–71 (2d Cir.1981).

Olin asserts that this doctrine is applicable in the present case. Olin asserts that the conduct of INA with regard to claims and potential claims of Olin about environmental clean-ups involved a general and categorical denial of all such claims as of 1984. According to Olin, the right to rely on the notice requirements in the insurance policies was waived by INA thereafter. The culminating event in 1984, which Olin relies upon as finally constituting waiver of notice by INA, was the assertion of the second counterclaim in INA's answer in this action. This counterclaim states:

168. Olin has purported to send INA a number of other pollution claims, which involve the same or substantially the same coverage issues involved in this action.

169. A controversy exists between INA and Olin with respect to these other pollution claims.

170. INA requests and is entitled to a declaration of Olin's and INA's duties and obligations, or lack thereof, with respect to such other pollution claims.

Olin's theory is that this second counterclaim involved INA's attempt to lump together all issues regarding all sites in one litigation, and further involved INA's blanket rejection of all Olin's claims, constituting a waiver of INA's right to notice as to individual claims thereafter.

The evidence contains a detailed history of litigation in at least three federal courts, as the result of which there came to be one comprehensive action in the Southern District of New York. However, *both* Olin and INA indicated in various pleadings and other court papers that they wished to have the Olin environmental problems grouped into a single action. These positions had been asserted well before the time of INA's answer in the present action with its second counterclaim. In these pleadings and court papers, both Olin and INA basically sought to preserve all of their rights regarding claims and defenses as to all of the sites embraced in the litigation. The second counterclaim is an assertion of just such a position. It cannot be construed as a waiver of any of INA's rights, including the right to receive due notice from Olin.

The court concludes, on the basis of the litigation history and the other relevant evidence, that INA has made no blanket or categorical waiver of the notice requirement.

### Conclusion

The jury has found that there was injury to soil at the Williamston facility commencing in 1951 and continuing through 1967, when the Olin operation ceased. The jury found that the injury to soil, resulting from the Olin operation, continued during the years 1968 through 1985, which was the last year before the EPA clean-up order of September 1986. The jury found that there was injury to groundwater occurring during the years 1958 through 1985.

INA's insurance provided coverage for accidental injury, and that coverage was in effect for the years 1956 through 1970. Although Olin had INA insurance for the years 1971–1973, the jury has found that there was a pollution exclusion in effect in 1971, and Olin concedes that such an exclusion was in effect during 1972 and 1973.

It was necessary for the jury to decide whether there was or was not accidental injury to the soil and to groundwater during the years of insurance coverage. The jury found that there was accidental injury to soil for the years 1956 and 1957 but that the injury to soil was not accidental during the years 1958–1970. The jury found that there was accidental injury to groundwater during

the years 1958–1971, although this finding is irrelevant as to the year 1971 because of the pollution exclusion.

It is now necessary to summarize the rulings made by the court on issues reserved to the court.

■ The court finds that Olin was liable to the EPA for approximately $3.7 million in clean-up costs on account of injury to soil. These costs of $3.7 million constitute damages incurred by reason of legal liability to the EPA, within the meaning of the insurance provisions. However, INA is required to indemnify Olin only for that portion of the $3.7 million damages which is to be allocated to the years 1956 and 1957, because of the jury's finding that only in those years was the injury to soil accidental.

The court finds that Olin was liable to the State of North Carolina for approximately $400,000 in clean-up costs on account of injury to groundwater. These costs of $400,000 constitute damages incurred by reason of legal liability to the State of North Carolina, within the meaning of the insurance provisions. The jury found that the injury to groundwater was accidental during all those years. Since the jury found that the injury to groundwater commenced in 1958, INA is required to indemnify Olin for the portion of the $400,000 damages which is to be allocated to the years 1958 through 1970, which are the years of INA's insurance coverage relating to the groundwater damage.

The court does not accept Olin's contention that the damages for liability relating to the accidental injury to groundwater should be deemed to include the costs of soil removal.

On the subject of allocation, the $3.7 million cost of soil clean-up should be allocated *at least* over the years 1951–1970. INA is liable only for the years 1956 and 1957. Olin must bear the share allocable to the other years of the INA insurance coverage, 1958–1970, because of the non-covered nature of the injury. It is conceded, for purposes of this trial, that Olin must bear the share allocable to the years 1951–1955 because it was a self-insurer. The question of whether the $3.7 million should be spread over additional years beyond 1970—*i.e.*, the years 1971–1985—depends upon whether Olin was a self-insurer during those years. This is a contested issue, and will be the subject of further proceedings. The ruling on this issue will be made in the subsequent opinion.

The $400,000 cost of groundwater work should be allocated at least over the years 1958–1970. INA is liable for all those years. The question of whether the $400,000 should be spread over the additional years 1971–1985, again depends upon whether Olin was a self-insurer during those years, something which is again a contested issue to be dealt with in further proceedings and the subsequent opinion.

Since the $300,000 per occurrence limit is being applied on the basis of $300,000 per year, pursuant to the agreement of the parties, the $100,000 deductible will be similarly applied for each year. The court does not accept Olin's argument that there should be only one $100,000 deductible.

The court rules that there was no categorical waiver by INA of the notice requirement.

The court reserves for further proceedings and a subsequent opinion the issues: (1) whether Olin was a self-insurer during the years 1971–1985; (2) whether the owned property exclusion applies; and (3) the proper allocation of defense costs.

SO ORDERED.

APPENDIX A

BIG "O" JAMBOREE SITE MAP - WILLIAMSTON, NORTH CAROLINA

PLAINTIFF'S EXH 153