**OLIN CORPORATION, Plaintiff–Appellant–Cross–Appellee,**

**v.**

**INSURANCE COMPANY OF NORTH AMERICA, Defendant–Appellee–Cross–Appellant,**

**The Hanover Insurance Company, (as successor to Massachusetts Bonding and Insurance Company), AIU Insurance Company; Allstate Insurance Company (as successor to Northbrook Excess and Surplus Insurance Company); American Home Assurance Company; American Re–Insurance Company; Certain Underwriters at Lloyd's, London and London Market Insurance Companies; Commercial Union Insurance Company, (as successor to Employers' Liability Assurance Corporation, Ltd., Employers' Commercial Union Insurance Company of America, and Employers' Surplus Lines Insurance Company), Continental Casualty Company; The Continen-**

tal Corporation; Federal Insurance Company; Fireman's Fund Insurance Company; Government Employees Insurance Company; Granite State Insurance Company; Harbor Insurance Company; The Home Insurance Company; Indemnity Insurance Company of North America; Lexington Insurance Company; London & Edinburgh Insurance Company Limited; National American Insurance Company of California (as successor to Stuyvesant Insurance Company); National Casualty Company; National Union Fire Insurance Company of Pittsburgh; North River Insurance Company; New York Property Casualty/Insurance Security Fund, Defendants–Appellees,

Great American Insurance Company, Employers Insurance of Wausau, Defendants,

General Reinsurance Corporation, Third–Party–Defendant– Claimant–Appellee.

Docket Nos. 98–7687(L), 98–7753(XAP).

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1999

Decided Aug. 17, 2000

Stephen A. Dvorkin, Dickstein Shapiro Morin & Oshinsky LLP (Robert W. Pommer, III and Mary S. Santamarina, of counsel), New York, NY, for Plaintiff–Appellant–Cross–Appellee.

Paul R. Koepff, O'Melveny & Myers LLP (John L. Altieri, Jr., Charles W. Fournier and Ralph P. DeSanto, of counsel), New York, NY, for Defendant–Appellee–Cross–Appellant.

Patrick T. Walsh and Andrea C. Kenealey, Blatt, Hammesfahr & Eaton, Chicago, IL, for Defendants–Appellees Certain Underwriters at Lloyd's, London and London Market Insurance Companies and London and Edinburgh Insurance Company.

James P. Schaller and M. Elizabeth Medaglia, Jackson & Campbell, P.C., Washington, DC, for Defendants–Appellees American Home Assurance Company, Granite State Insurance Company, Lexington Insurance Company, AIU Insurance Company, and National Union Fire Insurance Company of Pittsburgh.

Dale C. Christensen, Jr. and John J. Galban, Seward & Kissel, New York, NY, for Defendant–Appellee The Hanover Insurance Company.

Daniel A. Bartoldus, Rivkin, Radler & Kremer, Uniondale, NY, for Defendant–Appellee Allstate Insurance Company.

Robert W. Muilenburg, McElroy, Deuthsch & Mulvaney, Morristown, NJ, for Defendant–Appellee North River Insurance Company.

Rocco Covino and Jennifer S. Huber, LeBoeuf, Lamb, Greene & MacRae LLP, Washington, DC, for Defendant–Appellee Government Employees Insurance Company.

James Stapleton and Stefan Underhill, Day, Berry & Howard LLP, Stamford, CT, for Third–Party Defendant–Claimant–Appellee. David M. Raim, Chadbourne & Parke LLP, Washington, DC, for Defendant–Appellee National American Insurance Company of California.

Brian R. Ade and Alexander H. Gillespie, Gilberg & Kiernan, New York, NY, for Defendant–Appellee Fireman's Fund Insurance Company.

Jonathan Gardner, Goodkind, Labaton, Rudoff & Sucharow LLP, New York, NY, for Defendants–Appellees American Re–Insurance Company, Continental Casualty Company, and Harbor Insurance Company.

James W. Greene, Thompson, O'Donnell, Markham, Norton & Hannon, Washington, DC, for Defendants–Appellees American Re–Insurance Company, Continental Casualty Company, and Harbor Insurance Company.

Richard H. Gimer, Semmes, Bowen & Semmes, Washington, DC, for Defendant–Appellee Commercial Union Insurance Company.

Virginia L. White–Mahaffey, Steptoe & Johnson LLP, Washington, DC, for Defendants–Appellees Federal Insurance Company and The Home Insurance Company.

Joseph DeDonato, Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, New York, NY, for Defendants–Appellees Federal Insurance Company and The Home Insurance Company.

Laura A. Foggan, Daniel E. Troy, and John C. Yang, Wiley, Rein & Fielding, Washington, DC, for Amicus Curiae Insurance Environmental Litigation Association.

Before: OAKES, McLAUGHLIN and SACK, Circuit Judges.

SACK, Circuit Judge:

Plaintiff–Appellant–Cross–Appellee Olin Corporation ("Olin") instituted this action seeking a judgment that its insurers are liable to indemnify it for cleanup costs it incurred at various contaminated properties. The United States District Court for the Southern District of New York (Thomas P. Griesa, then-*Chief Judge*) conducted both a jury and a bench trial to determine the liability of one insurer, Defendant–Appellee–Cross–Appellant Insurance Company of North America ("INA"), with respect to one of the Olin sites, which culminated in the entry of a final judgment pursuant to Federal Rule of Civil Procedure 54(b). In two separate opinions, *Olin Corp. v. Insurance Co. of N. Am.*, 972 F.Supp. 189 (S.D.N.Y.1997) ("*Olin I* "), and *Olin Corp. v. Insurance Co. of North America*, 986 F.Supp. 841 (S.D.N.Y.1997) ("*Olin II* "), the district court concluded that the costs incurred by Olin to remediate soil at the site were the result of its liability for damages resulting from injury to soil, not groundwater; that the liability incurred by Olin should be prorated over all the years in which the jury found that property injury had been sustained, not any subset thereof; that the $100,000 per occurrence insurance deductible applied to each year of triggered coverage and should not be prorated over the period of coverage; and that INA had not waived its right to notice of claims. Olin appeals each of these determinations. INA cross-appeals, claiming that the district court misinterpreted the term "accident" as used in the applicable insurance policies. We affirm on each issue.

## BACKGROUND

### The Contamination and Cleanup

In 1950, Olin acquired a fertilizer plant located in Williamston, North Carolina, along the Roanoke River (the "Williamston property" or the "Williamston site"). Olin initially produced dry pesticides at the site. In 1952 it began to manufacture liquid

pesticides there too. During the production processes, Olin regularly deposited and released dry and liquid pesticide components onto the soil.

Olin maintained its facilities and operations at the Williamston property for more than sixteen years, until November 1967. The property was then leased for one year to an entity referred to in the record as "Columbia Nitrogen." In 1968, Olin sold the property to Kerr–McGee Corporation. Neither Columbia Nitrogen nor Kerr–McGee manufactured or otherwise dealt with pesticides on the property.

Early in the 1980's, Kerr–McGee sold the Williamston property to one Odis Whitaker. From 1983 to 1985, Whitaker operated "The Big O's Jamboree," a weekend country-music dance hall, in the old pesticide production warehouse on the property. After an evening of dancing in June 1985, one of Big O's patrons contacted the U.S. Environmental Protection Agency (the "EPA") to complain about strong odors at the Big O site. It was the State of North Carolina, however, that began an investigation by taking soil samples at the Williamston property in late July 1985. The tests showed high concentrations of pesticides. The State therefore requested the assistance of the EPA in designing and implementing remedial action at the site.

In September 1986, the EPA issued an order pursuant to Section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9606(a), describing the actions to be taken at the Williamston site. The EPA concluded that "[i]n order to protect human health and welfare and the environment, it is necessary that action be taken to contain and terminate the release or threat of release of hazardous substance[s] from the site into the environment." The order required Olin to remove contaminated soil from the site and to "[i]nstall and sample monitoring wells in appropriate locations to identify the extent of groundwater contamination and to assure that the contamination is not migrating from the property."

In August 1987, the EPA issued another order that again included a requirement that Olin remove the contaminated soil at the site. The order also required testing of groundwater. In September 1987, a new monitoring well was installed between the site of Olin's former pesticide operations and a proposed town well. The monitoring well did not produce any evidence that pesticide-contaminated groundwater from the Williamston site was moving toward the proposed well.

In response to the August 1987 order, Olin began soil removal operations at the site in 1988. There were three main areas of removal: the one and one-half acres where the former pesticide plant and warehouse were located; a smaller area where metal drums had been buried in connection with Olin's pesticide operation; and another small area of petroleum contamination.[1]

In March 1990, the EPA issued a third order with respect to the Williamston site. It required expanded remedial work to include further soil removal and the dismantling of structures on the property that had contained pesticide materials. While the order recited concerns about the groundwater and the site's proximity to the town's proposed well, it contained no direction as to further groundwater work.

During the soil excavation, Olin and the EPA encountered difficulty with a ditch and a large hole on the property. The soil in these two areas had particularly high concentrations of pesticides that required excavation to a depth below that of the water table. As excavation near the hole proceeded, water flowed into the excavation site. The water entering the hole was

1. The petroleum contamination was a result of Kerr–McGee's operations on the property. Kerr–McGee reimbursed Olin for the expenses associated with this portion of the remediation and those expenses therefore do not figure in this litigation.

found to be contaminated. To prevent this continuing recontamination, the incoming water was collected in a 50,000 gallon pool and then run through carbon and sand filters until the EPA was satisfied that the residual contamination level of the water posed no additional threat. The water was then discharged into areas that had previously been refilled with "clean" soil. According to the EPA field notes, "The groundwater would not be considered a priority at this time but is a long term decision [sic] that will require some thought and would not be covered under this order."

During the soil removal, at a time not disclosed in the record, a well used on the site during the Olin operation was damaged. In February 1991, the well's contents were tested, revealing the presence of twenty different pesticides in the water. As a result, the State of North Carolina issued a notice of violation on June 25, 1991. Despite the EPA's knowledge of this asserted violation, on November 13, 1991, it issued a notice to Olin that its orders had been fully complied with. But in response to the 1991 State notice of violation, nineteen monitoring wells were installed and operated. Testing of the new wells revealed contamination from pesticides in the groundwater, but only in the "surficial" groundwater, which is not a source for well water. The tests also revealed evidence that the contamination was being carried to the Roanoke River, though not in concentrations large enough to cause damage to the river. Consultants hired to monitor the cleanup determined, as the district court explained, "that the soil removal and replacement carried out by Olin for the EPA had essentially removed the source of the groundwater contamination." *Olin I*, 972 F.Supp. at 193.

Olin thereafter requested that the State require no further action at the Williamston site. The State agreed and, on May 7, 1996, stated that whatever groundwater contamination remained would be remediated by "natural attenuation"; that is, with

the source of contamination gone, the water would be left to flow to the Roanoke River and purify itself over time. Olin was permitted to maintain its monitoring of the wells and test on a reduced basis. The monitoring is apparently still being conducted.

As a result of the orders by the EPA and the State of North Carolina, respectively, Olin spent approximately $3.7 million on soil cleanup and $362,000 on groundwater work.

## The Insurance Policies

From January 1, 1956 through December 31, 1973, INA provided Olin with comprehensive general liability insurance. The policies covered consecutive one-year periods and provided insurance for Olin's liabilities for personal injury and property damage.

From 1956 through 1968, the INA policies provided coverage for liability for damages because of injury to property as follows:

> [INA agrees t]o indemnify the insured for all sums which the insured shall become obligated to pay by reason of the liability imposed upon the insured by law, or assumed by the insured under contract or agreement, for damages because of injury to or destruction of property, including the loss of use thereof, caused by accident.

The term "accident" was defined to include "a series of accidents arising out of one event." Each policy also stated: "There is no limit to the number of occurrences or accidents for which claims may be made hereunder provided such occurrences or accidents happen during the policy period." Olin was indemnified for up to $300,000 per occurrence or accident with a $100,000 per occurrence or accident deductible.

In 1969 the policy language was changed to provide coverage for "all sums which the insured shall become legally obligated to pay as damages because of . . . personal

injury or ... property damage to which th[e] insurance applies, caused by an occurrence." "Occurrence" is defined by these policies as "an accident, including injurious exposure to conditions, which results, during the policy period, in property damage neither expected nor intended from the standpoint of [Olin]." INA's duties to Olin are to "appl[y] only to personal injury or property damage which occurs anywhere during the policy period." As with the pre–1969 policies, INA is obligated to provide indemnification to Olin for up to "$300,000 as the result of any one occurrence," with a $100,000 per occurrence deductible.

### The Litigation

Invoking the diversity jurisdiction of the federal courts, Olin originally brought this lawsuit in the United States District Court for the District of Columbia to determine, *inter alia*, various insurers' liability under the property damage liability portions of their policies with respect to Olin's liability related to pollution at several sites. In early 1984, the action was transferred to the District Court for the Southern District of New York. It was eventually assigned to Judge Griesa, who ultimately held both a jury trial and a bench trial with regard to the duty of one insurer (INA) to indemnify Olin for liability for injury to property at one site (Williamston).

Despite the differences in language between the earlier and later policies, the district court held that the "essential nature of the coverage for accidental injury to property did not change." *Olin I*, 972 F.Supp. at 191–92. The court concluded: "An unintended act resulting in an unintended injury is clearly accidental injury. However, an intended act resulting in an unintended injury is also an accidental injury." *Id.* at 194. The district court told the jury while instructing it that the term "accident" was not limited to an abrupt, one-time event; it included progressive, continuing events.

Although Olin was insured by INA through 1973, there was no claim that INA was required to provide coverage under the 1972 and 1973 policies. The parties agreed that those policies contained effective and applicable "pollution exclusion" clauses. From 1974 through 1985, Olin obtained general liability insurance policies from other companies. All of them contained pollution exclusion clauses. The parties disagreed, however, as to the presence of a pollution exclusion clause in the 1971 policy.

A jury trial was held to resolve, by means of special verdicts, various issues of fact as a basis for a subsequent bench trial and decisions by the district court. The jury concluded, *inter alia*, that the pollution exclusion was present in the 1971 policy. As a result, INA could only be required to indemnify Olin for liability resulting from accidental damage to property at the Williamston site from 1956 through 1970.

Because even the 1956 through 1970 policies without the pollution exclusion clause did not cover liability for damages resulting from intentional injury to property, the jury was asked to decide for which of those years property injury at the Williamston site was accidental. The jury was also asked whether the injury was to soil or groundwater. The jury found that injury to soil occurred in each of the years 1956 through 1971, but that only the injury caused in 1956 and 1957 was accidental. The jury also found that injury to groundwater occurred in each of the years 1958 through 1971, and that all the injury to groundwater was accidental. For the years during which no INA policy was applicable, the jury was asked only whether there was injury to property during those years and whether it was a source of Olin's cleanup expenses. The jury found that there was such injury to property during each of the years 1951 through 1955 and 1972 through 1985, and that these injuries were a source of Olin's cleanup costs. Finally, the jury was asked

to assess the bases for the EPA's cleanup orders. The jury concluded that the EPA had imposed these orders "on account of" both "a threat to humans and wildlife from contaminated soil" and "a threat that contaminated soil would injure groundwater." The jury also found that "the costs of removing contaminated soil and buildings from the [Williamston] site [were] required to remedy damage to groundwater."

After the jury trial was completed, the bench trial began. Since the jury had decided that only the 1956 and 1957 soil injury was accidental and therefore covered by the INA policy but that all the groundwater injury from 1958 through 1970 was accidental, the district court found it necessary to determine what liability was incurred by Olin to remediate which injury. In *Olin I*, filed July 7, 1997, the district court concluded "that the EPA required Olin to engage in the $3.7 million project for the purpose of ridding the site of contaminated soil *as soil*," 972 F.Supp. at 199 (emphasis in original), not as part of a groundwater investigation or cleanup. Thus, all of Olin's remediation costs attributable to liability under the EPA orders were for injury to soil. Because the only accidental soil injuries were in 1956 and 1957, INA was obligated to cover only the 1956 and 1957 portion of the costs incurred as a result of the EPA's orders.

The district court determined that Olin's liability to the State did not include any of the $3.7 million spent on soil removal. The court provided two grounds for this conclusion. First, as a legal matter, Olin was not technically required under the State order to incur the approximately $3.7 million expense for soil removal. That liability arose under the EPA orders. *See id.* at 199. Second, the district court found no reason to conclude that such an extensive soil removal program would have been required by the State to remedy groundwater injury. *See id.* at 201–02. The liability for injury to groundwater was therefore limited to the roughly $362,000 spent on the monitoring wells installed in response to the State's June 1991 order. *See id.* at 204.

The district court next concluded that the $100,000 deductible was applicable to each year in which a policy was in effect because Olin claimed that the policies' $300,000 per occurrence coverage applied anew for each policy year. *See id.* at 202. In the final portion of its opinion, the district court concluded that INA had not categorically waived its right to assert Olin's failure to provide notice of claims as a defense. *See id.* at 202–03.

Subsequently, in *Olin II*, dated December 24, 1997, the district court decided that for all periods prior to 1956 and beginning again in 1971, Olin was not insured against pollution-related injury. *See Olin II*, 986 F.Supp. at 843. In light of the availability to Olin of gradual-pollution insurance and Olin's failure to purchase it, the court decided that Olin effectively had decided to self-insure during the years that it did not purchase insurance. *See id.* at 844–45. The cost resulting from liability was therefore prorated over all the years in which the jury found injury to have occurred, with Olin paying for liability apportioned to any year it did not have applicable insurance. *See id.* at 845.

The net effect of the jury's special verdict, the district court's findings of fact and law, and the judgment entered by the district court are summarized in the following table. The last column represents the ultimate indemnification Olin is to receive from INA under its annual policies with respect to the Williamston site according to the district court's judgment. Shaded cells are years in which Olin carried INA general liability insurance without a pollution exclusion for each medium—soil and groundwater—for which the jury found accidental injury.

| Year | Liability for Soil | Liability for Ground-water | Total Liability for Each Year | Amount Allocated to INA | INA Policy Indem. (Less $100,000 Deduct-ible) |
|---|---|---|---|---|---|
| 1951 | $105,648.54 | $0.00 | $105,648.54 | no policy | $0.00 |
| 1952 | $105,648.54 | $0.00 | $105,648.54 | no policy | $0.00 |
| 1953 | $105,648.54 | $0.00 | $105,648.54 | no policy | $0.00 |
| 1954 | $105,648.54 | $0.00 | $105,648.54 | no policy | $0.00 |
| 1955 | $105,648.54 | $0.00 | $105,648.54 | no policy | $0.00 |
| 1956 | $105,648.54 | $0.00 | $105,648.54 | $105,648.54 | $5,648.54 |
| 1957 | $105,648.54 | $0.00 | $105,648.54 | $105,648.54 | $5,648.54 |
| 1958 | $105,648.54 | $12,952.00 | $118,600.54 | $12,952.00 | $0.00 |
| 1959 | $105,648.54 | $12,952.00 | $118,600.54 | $12,952.00 | $0.00 |
| 1960 | $105,648.54 | $12,952.00 | $118,600.54 | $12,952.00 | $0.00 |
| 1961 | $105,648.54 | $12,952.00 | $118,600.54 | $12,952.00 | $0.00 |
| 1962 | $105,648.54 | $12,952.00 | $118,600.54 | $12,952.00 | $0.00 |
| 1963 | $105,648.54 | $12,952.00 | $118,600.54 | $12,952.00 | $0.00 |
| 1964 | $105,648.54 | $12,952.00 | $118,600.54 | $12,952.00 | $0.00 |
| 1965 | $105,648.54 | $12,952.00 | $118,600.54 | $12,952.00 | $0.00 |
| 1966 | $105,648.54 | $12,952.00 | $118,600.54 | $12,952.00 | $0.00 |
| 1967 | $105,648.54 | $12,952.00 | $118,600.54 | $12,952.00 | $0.00 |
| 1968 | $105,648.54 | $12,952.00 | $118,600.54 | $12,952.00 | $0.00 |
| 1969 | $105,648.54 | $12,952.00 | $118,600.54 | $12,952.00 | $0.00 |
| 1970 | $105,648.54 | $12,952.00 | $118,600.54 | $12,952.00 | $0.00 |
| 1971 | $105,648.54 | $12,952.00 | $118,600.54 | exclusion | $0.00 |
| 1972 | $105,648.54 | $12,952.00 | $118,600.54 | exclusion | $0.00 |
| 1973 | $105,648.54 | $12,952.00 | $118,600.54 | exclusion | $0.00 |
| 1974 | $105,648.54 | $12,952.00 | $118,600.54 | no policy | $0.00 |
| 1975 | $105,648.54 | $12,952.00 | $118,600.54 | no policy | $0.00 |
| 1976 | $105,648.54 | $12,952.00 | $118,600.54 | no policy | $0.00 |
| 1977 | $105,648.54 | $12,952.00 | $118,600.54 | no policy | $0.00 |
| 1978 | $105,648.54 | $12,952.00 | $118,600.54 | no policy | $0.00 |
| 1979 | $105,648.54 | $12,952.00 | $118,600.54 | no policy | $0.00 |
| 1980 | $105,648.54 | $12,952.00 | $118,600.54 | no policy | $0.00 |
| 1981 | $105,648.54 | $12,952.00 | $118,600.54 | no policy | $0.00 |
| 1982 | $105,648.54 | $12,952.00 | $118,600.54 | no policy | $0.00 |
| 1983 | $105,648.54 | $12,952.00 | $118,600.54 | no policy | $0.00 |
| 1984 | $105,648.54 | $12,952.00 | $118,600.54 | no policy | $0.00 |
| 1985 | $105,648.54 | $12,952.00 | $118,600.54 | no policy | $0.00 |
| Total: | $3,697,699.00 | $362,656.00 | $4,060,355.00 | | $11,297.08 |

Olin appeals each of the determinations by the district court following the bench trial. INA contends in its cross-appeal that the district court erred in concluding that despite the changes in policy language, the "essential nature" of all policies was to cover accidental damages as the court defined them.

## DISCUSSION

### I. The Cross–Appeal

Because of its potential impact on the other issues on appeal, we address INA's cross-appeal first.

### A. The Meaning of "Accident" Under New York Law

INA asserts that based on an erroneous conception of the term "accident," the district court erred in denying its motion for judgment as a matter of law dismissing all of Olin's claims and similarly erred in instructing the jury on the meaning of the term. Even if its reading of the term "accident" is wrong, INA continues, the word was at least ambiguous and the district court therefore erred in not allowing INA to present testimony as to its meaning. "Accident," says INA, means an "injury-causing event [that] happen[s]

abruptly or quickly." Gradual release of pollutants and the injury it causes are not covered by the term, according to INA.

■ We disagree. As the district court recognized, *see Olin I,* 972 F.Supp. at 194, the word "accident," according to New York law, includes unintended damage irrespective of the time period over which it occurred. This definition of "accident" was drawn by the court from the New York Court of Appeals' opinion in *McGroarty v. Great American Insurance Co.,* 36 N.Y.2d 358, 329 N.E.2d 172, 368 N.Y.S.2d 485 (1975). The *McGroarty* court framed the question before it as

> whether an accident occurred as the meaning of that term is contemplated in the policy of insurance issued by defendant, where plaintiff's building gradually cracked, settled and was damaged over a period of several months due to the continuing excavation and construction on certain adjacent property owned by the insured.

36 N.Y.2d at 361, 329 N.E.2d at 173, 368 N.Y.S.2d at 487. The court determined that this presented a question of fact and that the fact finder must apply the " 'transaction as a whole' " test. *See* 36 N.Y.2d at 364, 329 N.E.2d at 175, 368 N.Y.S.2d at 490 (quoting *Messersmith v. American Fidelity Co.,* 232 N.Y. 161, 166, 133 N.E. 432, 433 (1921) (Cardozo, J.)). It went on to hold that "regardless of the initial intent or lack thereof as it relates to causation, or the period of time involved, if the resulting damage could be viewed as unintended by the fact finder the total situation could be found to constitute an accident." 36 N.Y.2d at 364–65, 329 N.E.2d at 175, 368 N.Y.S.2d at 490. Based on this understanding of the term, the district court determined that the key to whether the environmental damage at the Williamston property was "caused by acci-

dent" turned here on whether the resulting property damage was caused by Olin intentionally. We agree.

INA contends that the district court erred by not utilizing the definition of "accident" articulated by the New York Supreme Court, Appellate Division, in *Borg–Warner Corp. v. Insurance Co. of North America,* 174 A.D.2d 24, 36, 577 N.Y.S.2d 953, 960 (3d Dep't 1992). INA stresses the *Borg–Warner* court's statement that " 'only sudden discharges of pollutants, referable to a fixed time, [fall] within the accident-based policy's coverage.' " *Id.* (alteration in original) (quoting Note, *The Pollution Exclusion Clause Through the Looking Glass,* 74 Geo. L.J. 1237, 1241–42 (1986)). INA also cites other lower court decisions that have construed "accident" to require a sudden or abrupt injury-causing event.

In the face of contradictory treatment of the term "accident" by the New York Court of Appeals, we do not find these lower court decisions to be reliable statements of the meaning of the term under New York law. *Cf. Travelers Ins. Co. v. 633 Third Assocs.,* 14 F.3d 114, 119 ("In considering state decisional law, we must afford the fullest weight to the pronouncements of the New York Court of Appeals.") *Borg–Warner's* definition was of limited precedential value in any event: It was an alternate holding that followed the Appellate Division's affirmance of the trial court on two other grounds.

■ We are also not persuaded by INA's argument that the State's highest court's denial of review in *Borg–Warner* is significant. *See Marchant v. Mead–Morrison Mfg. Co.,* 252 N.Y. 284, 298, 169 N.E. 386, 391 (1929) (Cardozo, C.J.) (denial of review has at most "token" significance and is comparable to United States Supreme Court's denial of certiorari);[2] *see*

---

**2.** A refusal [of the New York Court of Appeals] to take jurisdiction of a cause has not the force of an affirmance after jurisdiction has been taken.... [C]ourts are at liberty, if they please, to give to such a refusal some

measure of significance, as a token, though indecisive, of the impressions of [the New York Court of Appeals]. They are not bound thereby as by an authoritative precedent. This is the rule in the Supreme Court of the

*also Brooklyn Hosp. v. Lennon,* 45 N.Y.2d 820, 820–21, 381 N.E.2d 608, 608, 409 N.Y.S.2d 210, 210 (1978) (stating that "denial of a motion for leave to appeal is not equivalent to an affirmance and has no precedential value"); *cf. Agoston v. Pennsylvania,* 340 U.S. 844, 844, 71 S.Ct. 9, 95 L.Ed. 619 (1950) (memorandum of Frankfurter, J., respecting denial of certiorari) ("[B]y denying leave for review here of a lower court decision this Court lends no support to the decision of the lower court. Obviously it does not imply approval of anything that may have been said by the lower court in support of its decision."). The denial of review in *Borg–Warner* is particularly meaningless because the Appellate Division presented three rationales for its affirmance of the trial court's decision. *See* 174 A.D.2d at 36, 577 N.Y.S.2d at 960. Even if we were generally free to consider denial of review by the Court of Appeals as precedential, it would be impossible to infer from the denial of review in this case which of the Appellate Division's rationales the Court of Appeals might have been approving.

### B. The Meaning of "Accident" as Used in the Policies

INA argues that irrespective of *McGroarty*'s use of the word "accident," the terms and structure of the relevant policies make clear that the meaning of the term under the policies does not include the gradual infliction of damage. The argument goes something like this: The policy language in effect from 1956 through 1968 expressly distinguished between "accidents" and "occurrences," providing coverage for liability incurred by the insured because of injury to property "caused by accident," while providing personal injury coverage based on an "occurrence." The post–1968 policies then defined "occurrence" to "include exposure to conditions" making it clear that an "occurrence" covers gradual events. Since "acci-

dents" and "occurrences" are different and the term "occurrence" specifically includes gradual events, the term "accident" does not. And "occurrences," which thus alone include gradual injury, do not give rise to indemnification for liability with respect to property damages under the policies; only "accidents," which do not include gradual injury, do. *See* INA's br. at 26.

We disagree. First, there is nothing in the 1956 through 1968 policies that indicates that there is a distinction between "accident" and "occurrence" with respect to whether injury is incurred suddenly or gradually. What subsequent policies covering 1969 and later years say about "accident" and "occurrence" is of little help in understanding what the words meant when employed many years before by the drafters of the 1956 through 1968 policies.

Second, even if reference to the definition of "occurrence" in subsequent policies was helpful, INA's argument would not be. It attempts to rely on the distinction between "accidents" and "occurrences" established by the post–1968 policies to prove that because "occurrences" include gradual infliction of property damage, "accidents" do not. The argument founders on the fact that the post–1968 policies define an "occurrence" as an "accident," stating: " '[O]ccurrence,' as respects ... Property Damage Liability, *means an accident* ... which results ... in property damage neither expected nor intended ...." (emphasis added). An "occurrence" is unlikely to be both different from an "accident" as INA argues, yet defined as "an accident" as the policy says.

### C. The Ambiguity of "Accident" and the Admissibility of Testimony as to its Meaning

■ Under New York law, extrinsic or parol evidence may be admitted as to the meaning of the terms of a written contract when the terms are ambiguous. *See In-*

United States upon the denial of applications for writs of certiorari.

*Marchant,* 252 N.Y. at 298, 169 N.E. at 391.

*vestors Ins. Co. of Am. v. Dorinco Reinsurance Co.,* 917 F.2d 100, 104 (2d Cir. 1990). "Even where some ambiguity lurks in the language of the contract, a court may still construe the contract, if it can do so without reference to extrinsic circumstances or evidence." *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 148 (2d Cir.1993).

■ INA argues that if the term "accident" does not clearly exclude gradual injury, it is ambiguous and the district court therefore erred in refusing to hear testimony from Bernard A. Buge, Jr., a former INA underwriter, on the meaning of the term as used in the 1956 through 1968 policies. We review the district court's exclusion of Buge's testimony for abuse of discretion. *See Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 150 (2d Cir.1997). And "even an erroneous evidentiary ruling will not lead to reversal unless affirmance would be 'inconsistent with substantial justice.'" *Id.* (quoting Fed.R.Civ.P. 61).

Even if the policy language was ambiguous, we doubt that Buge was in a position to give testimony that would have been of significant help to the district court in attempting to discern the meaning of the language contained in the INA policies from 1956 through 1968. "[W]here contract language is susceptible of at least two fairly reasonable meanings, the parties have a right to present extrinsic evidence of their intent *at the time of contracting.*" *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 9 (2d Cir.1983) (emphasis added). But Buge was not the underwriter in charge of Olin's account when Olin purchased those policies and therefore was unlikely to have been in a position to provide the court with such evidence.

We conclude therefore that the district court did not abuse its discretion by excluding Buge's testimony. The district court's ruling was hardly "inconsistent with substantial justice." We affirm the district court's judgment with respect to the issues raised on INA's cross-appeal.

## II. The Appeal

### A. Whether Olin's Soil Removal Costs Resulted from Liability for Unintended Damage to Groundwater

■ *1. Damage to Soil Versus Damage to Groundwater* Under its policies with INA, Olin was entitled to indemnification for "liability imposed upon the insured by law ... for damages because of injury to or destruction of property ... caused by accident." The jury found that during the fifteen years in which the INA policies were in effect and did not exclude liability for damages resulting from pollution injury, injury to the soil was "caused by accident," and therefore covered by the policies, only during 1956 and 1957. It found, however, that injury to groundwater was "caused by accident," and covered by the INA policy for each of the thirteen years 1958 through 1970. Olin thus had substantially greater coverage for injury to groundwater than it did for injury to soil. But Olin spent far more money in direct response to the EPA's order designed to remediate soil than it did in response to the State of North Carolina's order directed to protection against groundwater pollution—about $3.7 million for the former and $362,000 for the latter. Olin has therefore insisted that at least some of the money that it spent for soil cleanup, its less-covered liability, should be attributed to its better-covered liability for groundwater damage. Olin's theory is that the soil cleanup was necessary for and resulted in the protection of the groundwater.

The district court stated that "[i]n order to fit the circumstances of the present case into the framework of the insurance, one must answer the following questions: What was it that Olin was liable to the EPA *for?* What was it that Olin was liable to the State of North Carolina *for?*" *Olin I,* 972 F.Supp. at 196 (emphasis in original). The court painstakingly reviewed the record and determined that the costs of the soil cleanup performed by Olin did not constitute damages resulting from its

liability for injury to groundwater. The court held, in essence, that although remediating the soil had the effect of preventing groundwater pollution, the soil cleanup was in response to the EPA's requirement that the soil be remediated, not North Carolina's requirement that groundwater be monitored and protected. The cost of the soil cleanup therefore did not result from liability for damages incurred because of injury to groundwater. *See id.* at 201.

We review *de novo* the district court's interpretation of the contract to require an examination of the particular liabilities the State and the EPA imposed on Olin. *See Seiden Assocs. Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 429 (2d Cir.1992); *Hartford Accident & Indem. Co.,* 33 N.Y.2d 169, 172, 305 N.E.2d 907, 909–10, 350 N.Y.S.2d 895, 898. We review the district court's findings of fact for clear error. *See International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 753 (2d Cir.1996). Because the insurance contract refers specifically to "liability imposed upon the insured by law ... for damages ... caused by accident," we hold that the district court properly focused on the question of what liabilities actually were imposed because of the accidental damage. We also hold that the district court did not clearly err in finding that neither the EPA nor the State "imposed" on Olin the cost of cleaning up the soil because of injury to groundwater. The costs were incurred, as the district court put it, "for the purpose of ridding the site of contaminated soil *as soil.*" *Olin I,* 972 F.Supp. at 199 (emphasis in original). The $3.7 million that Olin was forced to pay for soil removal was therefore liability it incurred because of injury to property— soil—that except for the years 1956 and 1957, was not "caused by accident" and therefore not insured by INA.

■ *2. Olin's Seventh Amendment Arguments* Olin argues on appeal that the district court's finding that the $3.7 million expense was imposed for soil rather than groundwater damage contradicts the jury's special verdict and therefore violates the Seventh Amendment's command that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII; *see also LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 430 (2d Cir.1995) ("[W]hatever its own view of the facts may have been, the [district] court was not entitled to substitute its view for adequately supported findings that were implicit in the jury's verdict."). We conclude that the district court's decision is not inconsistent with the jury's special verdict.

The jury finding that the EPA's orders were motivated at least partially by "a threat that contaminated soil would injure groundwater," is not inconsistent with the district court's conclusion that Olin did not incur its clean-up costs because of liability for injury to the groundwater. *See Olin I,* 972 F.Supp. at 201. Whatever the various motivations of the EPA may have been, the EPA ordered Olin to clean up the soil. Olin's liability was based on those orders. Olin was no less liable for soil remediation because cleaning up the soil alleviated another problem that also concerned the EPA, the threat that contaminated soil would eventually pollute the groundwater. *Cf. Maryland Casualty Co. v. Armco, Inc.,* 822 F.2d 1348, 1353–54 (4th Cir.1987) (costs incurred in taking preventive measures to avert possible future health risks do not represent current "property damage"), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988).

The jury also found that "the costs of removing contaminated soil and buildings from the Big O [Williamston] site [were] required to remedy damage to groundwater." Again there is no inconsistency between this finding and the district court's. INA is only required to indemnify Olin for legal liabilities. Olin's legal liability arising from the EPA orders was to clean up the soil, at an eventual cost of $3.7 million. That that resulted in alleviating a risk to

groundwater that was the target of a subsequent State of North Carolina order does not render it something other than a legal liability arising out of the EPA order for cleanup of soil. The happy fact that a remedial effort required by an order of one agency provided multiple benefits, one of which avoided or attenuated costs of complying with an order of another agency, does not mean that the remedial effort was not in response to the first order.

To summarize, Olin's liability arising out of the EPA order to remove the soil at the Williamston site was incurred because of the injury to soil. That injury was unintentional, and therefore covered by the policies, for only two of the years in which Olin operated at the site under an insurance contract with INA, and was intentional, and therefore not covered, for the remainder of the period that Olin was insured by INA. The only orders that the State imposed on Olin were to drill sampling wells and perform monitoring, and liability under these orders is properly attributed to the accidental injury to groundwater, and therefore covered by thirteen consecutive INA policies.

■ *3. Settlement of the Claim of Damage to Groundwater* Finally, Olin argues that its remediation of the soil was in fact a settlement of its potential liability to the EPA with respect to groundwater, and therefore the expenses for cleaning up the soil were, at least in part, settlement for damage to the groundwater. The district court correctly concluded, to the contrary, that because the EPA never issued an order addressing the groundwater at the Williamston site and never asserted any claim against Olin for the unintentional groundwater injury, Olin could not have incurred the soil removal costs as the reasonable settlement with the EPA of a groundwater claim. *See Luria Bros. & Co. v. Alliance Assurance Co.,* 780 F.2d 1082, 1091 (2d Cir.1986) (stating that when insurer declines coverage, insured may settle rather than proceed to trial to determine its legal liability and that to recover settlement amount from insurer, insured need establish only potential liability on the facts known and that the settlement was reasonable); *Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1378–79 (E.D.N.Y.1988) (same). It is true, then, that Olin opted to cooperate with the EPA rather than require the EPA to implement the remediation program itself and institute a subsequent action to collect its costs from Olin, and Olin's soil removal might therefore be viewed as a settlement of the EPA's claim for soil damage. But the EPA never made a claim for groundwater damage, and Olin's soil removal therefore cannot be viewed as a settlement of any such claim.

*B. Allocation*

Olin had annual comprehensive general liability ("CGL") insurance policies with INA from 1956 through 1973. The policies for 1971 through 1973 contained clauses that excluded Olin's liability with respect to pollution-related damages. The jury found injury to property at the Williamston site from 1951 through 1985. To determine the extent of INA's and Olin's respective responsibilities for the costs in fact incurred at the site as a result of these damages over the course of the thirty-five years during which they were incurred, two questions must be answered: (1) which policies were "triggered," i.e., which policies were both in effect and providing Olin with coverage for the liability for accidental property damage that Olin incurred, and (2) what the scope of coverage is with respect to each triggered policy.

■ *1. Triggered Policies* Under CGL policies such as INA's, the insurer's duty to indemnify for liability resulting from accidental property damage is ordinarily triggered by occurrence of the property damage during the policy period. *See Dicola v. American S.S. Owners Mut. Protection & Indem. Ass'n, Inc. (In re Prudential Lines Inc.),* 158 F.3d 65, 83 (2d Cir.1998) ["*In re Prudential Lines*"]; *Stonewall Ins. Co. v. Asbestos Claims*

*Management Corp.*, 73 F.3d 1178, 1192 (2d Cir.1995), *modified on denial of reh'g*, 85 F.3d 49 (2d Cir.1996). The jury found that there was injury to property at the Williamston site for which Olin was liable from 1951 through 1985. The soil damage was unintentional, and therefore covered by an INA policy only in 1956 and 1957. All the groundwater damage was unintentional and Olin's liability for it was therefore potentially covered by an INA policy in 1958 through 1985. Because liability for the Williamston property damage was not covered by INA between 1951 and 1955 and 1971 and 1985, however, only the 1956 through 1970 INA policies were triggered by the occurrence of the property damage.

■ *2. Scope of Coverage* Where there is on-going and progressive injury that spans many years, as there was at the Williamston site, the question "is whether each [triggered] policy is liable for the entirety of [the liability for the injury] or whether each policy is responsible for paying only the portion of the [liability] somehow attributable to the amount of injury during the policy period." *In re Prudential Lines*, 158 F.3d at 84; *see also Owens–Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 459–64, 650 A.2d 974, 985–88 (1994). The parties have argued for different methods of determining the scope of a triggered policy's coverage. Olin contends that the district court should have applied what has come to be called the "joint and several" approach. Under it, the insured collects the total liability under any *one* triggered policy, up to that policy's coverage limit. *See In re Prudential Lines*, 158 F.3d at 83; *Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034, 1049–50 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982).

The claim is paid under the policy that the insured selects. The insurer on that policy may then seek contribution from the issuers of any other triggered policies. Under this method, Olin would attribute liability for all *soil* damage to either the 1956 or 1957 triggered policies, collecting $200,-000—the difference between the policy deductible and the policy limit—under that policy, and then attribute liability for all *groundwater* damage to any of the 1958 through 1970 triggered policies similarly collecting $200,000 under that selected policy.[3]

INA contends to the contrary that the district court was correct to apply "allocation." Under this methodology, liability for injury or damages is allocated among all triggered policies, and to the insured for periods of self-insurance, if any, based on some objective factor. *See In re Prudential Lines*, 158 F.3d at 84. We have left undisturbed district court decisions employing both the joint and several and the allocation approaches to determine the scope of a triggered policy's duty to indemnify, but we have never directly addressed when allocation is required or permitted. *Compare In re Prudential Lines*, 158 F.3d at 83–86 (using joint and several method) *with Stonewall*, 73 F.3d at 1201–04 (using allocation method).

There are several reasons for allocating. At the level of greatest generality, "An insured purchases an insurance policy to indemnify it against injuries occurring within the policy period, not injuries occurring outside that period." *In re Prudential Lines*, 158 F.3d at 84 (internal quotation marks omitted). Courts will therefore opt for allocation to avoid "[s]hoehorning

---

**3.** Olin has not told us whether its proposed joint and several approach would treat each medium (soil and groundwater) separately, applying one policy to liability with respect to one medium and another to liability with respect to the other, as this passage reflects, or whether the liability with respect to both media would be aggregated as "property damage" and then applied to a single policy. In

the latter case, Olin would recover only one $200,000 payment from a single policy. Because of the particular circumstances of this case, where accidental injury to soil and accidental injury to groundwater occurred in different years and are covered by different policies, this is an issue that we need not and do not address.

all damages into one policy period" under the joint and several approach, a process that is "intuitively suspect." *Id.* (internal quotation marks omitted, alteration in original) (quoting Comment, *Allocating Progressive Injury Liability Among Successive Insurance Policies*, 64 U. Chi. L.Rev. 257, 270 (1997)); *cf. Owens–Illinois*, 138 N.J. at 466, 650 A.2d at 989 ("[T]he argument that all sums to be assessed because of long-term exposure to asbestos could have been established in any one of the policy years is intuitively suspect and inconsistent with our developing jurisprudence in the field of toxic torts.").

More specifically, where the policies triggered are provided by multiple insurers, allocation avoids saddling one insurer with the full loss, the burden of bringing a subsequent contribution action, and the risk that recovery in such an action will prove to be impossible because, for instance, the insurer of other triggered policies is unable to pay. *See In re Prudential Lines*, 158 F.3d at 85; *see also United States Fid. & Guar. Co. v. Treadwell Corp.*, 58 F.Supp.2d 77, 98 (S.D.N.Y.1999); *Uniroyal*, 707 F.Supp. at 1392 ("Th[e] [joint and several] approach could easily be extremely unfair to an insurer who was on the risk for a day but who then is burdened with the entire loss incurred over several years."). Allocation results in the insured bearing the risk of any of its insurers' inability to pay, instead. There is logic in having the risk of such defalcation fall on the insured, which purchased the defaulting insurer's policy, rather than on another insurer which was a stranger to the selection process.

Allocation also forces an insured to absorb the losses for periods when it self-insured and can prevent it from benefitting from coverage for injuries that took place when it was paying no premiums. *See Uniroyal*, 707 F.Supp. at 1392 ("Self-insurance is called 'going bare' for a reason."); *Keene*, 667 F.2d at 1058 (Wald, J., concurring in part) ("[A]ll those who voluntarily assumed risk during the [relevant] period ... must share the responsibility for the judgment and this includes self-insurers."). Allocation may also be more efficient because "any contribution proceeding will involve many of the same issues that are raised in the initial liability proceeding, and ... it is more efficient to deal with these issues in a single proceeding." *In re Prudential Lines*, 158 F.3d at 85.

Where the triggered policies were obtained from a single insurer and there is no period of self-insurance with which to deal, the joint and several approach may be appropriate because there is little or no threat of future litigation seeking contribution. *See id.* at 83–86. In such situations, any subsequent "allocation" would involve simply "allocat[ing] liability among [the insurer's] own policies, ... in other words, allocation [i]s an issue merely of bookkeeping." *United States Fid. & Guar. Co.*, 58 F.Supp.2d at 99. The concern that one insurer may wind up incurring all of the loss while it in fact only underwrote a small portion of the risk is also absent. The joint and several approach can be applied in these situations without concern that the insured will in effect obtain coverage for a period for which it paid no premium. And applying the joint and several method avoids "the (probably unintended) effect of multiplying the deductibles applicable to each claim." *In re Prudential Lines*, 158 F.3d at 86. Because, under the joint and several approach, the insured collects against only one policy, it need worry only about paying the deductible for the single policy on which it elects to collect.

In determining which approach to employ, we look first to the language of Olin's INA policies. While the policies' language on the scope of liability once triggered is not free from ambiguity, we do find it consistent with allocation. *See, e.g., Uniroyal*, 707 F.Supp. at 1392. The earlier annual policies state that INA will indemnify for "all sums" that Olin "become[s] obligated to pay by reason of the liability

imposed upon [it] . . . for damages because of injury to . . . property . . . caused by accident" provided "the accident[ ] happen[ed] *during the policy period* " (emphasis added). That is at least consistent with the theory that INA promised to pay only for the portion of progressive injury that arose from that part of an accident occurring during the policy period, the language is therefore consistent with application of the allocation methodology.

In later policies, INA promises to pay "all sums" Olin became "obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence." The policy then states that "[t]his insurance applies only to . . . property damage which occurs anywhere *during the policy period.*" (Emphasis added). Again, this is at least consistent with INA's assertion that the policies were meant to limit the scope of coverage once triggered to *only* that property damage that actually was incurred during the year the triggered policy was in force, and is therefore consistent with use of the allocation method.

Because the language is inconclusive, however, we turn to public policy and equitable considerations. *See In re Prudential Lines,* 158 F.3d at 86. These, we think, clearly indicate allocation.

As we discuss in subsection 3, below, we conclude that for a substantial period during which, according to the jury, there was soil or groundwater damage, Olin, paying no premiums to INA, was either uninsured or self-insured. Allocation is appropriate to prevent Olin from imposing liability on INA for injuries that occurred during those periods and arose largely from accidents during these periods in which Olin was not paying for coverage.

In the context of this litigation, moreover, allocation serves the cause of efficiency. Any "contribution action" INA might be entitled to bring under the joint and several approach, against Olin for the latter's period of self-insurance, *see Keene,* 667 F.2d at 1034 n. 6 (Wald, J., concurring in part), would involve many of the same issues that arose in this proceeding. The duplication of effort and expense is unnecessary.

We also think that the "joint and several" approach is inappropriate here because the soil liability was found by the jury to have been sometimes unintentionally and sometimes intentionally caused by Olin. Absent the many years of intentional injury to soil, the costs incurred by Olin to remediate the soil likely would have been far less than the $3.7 million actually expended. To allow Olin to recover "all sums" for liability incurred as a result of progressive damage to soil between 1956 and 1985—some $3.7 million—from a single policy for 1956 or 1957, the only two years during which the damage was accidental (and therefore covered), would be to give Olin a windfall for uncovered damages, however limited that windfall might be because of the selected policy's maximum per-occurrence liability.

To be sure, allocation has the effect of applying many years' deductibles to a single claim. *See In re Prudential Lines,* 158 F.3d at 86. Under the joint and several approach, it appears that Olin would have received $200,000 for its claim with respect to soil damage under the 1956 or 1957 policies—the $300,000 policy limit less the $100,000 deductible—and $200,000 for its claim with respect to groundwater damage under the 1958 or a later policy—the $300,000 policy limit less the $100,000 deductible—instead of the total $11,000 to which they appear to be entitled under the allocation method. The nearly $390,000 difference is hardly paltry, but it does not compare to the effect of multiplying deductibles where many different claims are made with deductibles multiplied as to each of them, as was the case in *In re Prudential Lines.*

We conclude that the district court's approach was correct. On balance, under these circumstances, allocation was the

proper method to use to determine liability under the policies.

*3. Years over Which Liability is to be Allocated* The jury found that the injury to the Williamston property began in 1951 and continued into 1985. Olin was covered by INA insurance policies that included accidental injury to property from 1956 through 1970, its 1971, 1972, and 1973 policies having pollution exclusion clauses that made them inapplicable to Olin's claims with respect to damage at the Williamston property. Thus, for the years 1951 through 1955 and 1971 through 1985, there was injury occurring at the Williamston site for which Olin had no insurance.

In *Stonewall* we held that "a fair method of allocation appears to be one that is related both to time on the risk and the degree of risk assumed. When periods of no insurance reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available, to expect the risk-bearer to share in the allocation is reasonable."

73 F.3d at 1203 (quoting *Owens–Illinois*, 138 N.J. at 479, 650 A.2d at 995). Allocation need not be based strictly on the number of years during which injury was incurred and the number of years that the insurers and the insured were on the risk. *See, e.g., In re Prudential Lines*, 158 F.3d at 84; *Uniroyal*, 707 F.Supp. at 1393; *Owens–Illinois*, 138 N.J. at 463, 650 A.2d at 987–88. But the record does not disclose any other factor upon which to rely in making the allocation here. There is no way to determine, for example, whether injury to soil or groundwater at the Williamston site was greater during some periods and lesser during others. The district court therefore rightly allocated on the basis of the years during which INA insured the risk of environmental injury to soil or groundwater and the years during which Olin retained that risk for itself. The question is thus whether Olin decided "to assume or retain [the] risk," *Stonewall*, 73 F.3d at 1203 (internal quotation marks omitted) for any portion of gradual pollution damages at the Williamston site.

The district court found that beginning in 1971, "for all practical purposes, Olin could not obtain general comprehensive liability [insurance] without a pollution exclusion [clause]." *Olin II*, 986 F.Supp. at 844. Coverage for gradual pollution damage to property therefore could not thereafter be obtained through the purchase of a CGL policy. *See id.*

An insured assumes a share of the risk "either by declining to purchase available insurance or by purchasing what turn[s] out to be an insufficient amount of insurance." *Stonewall*, 73 F.3d at 1204. For Olin to have decided to "assume or retain [the] risk," there had to have been an opportunity for it to obtain some form of generally available insurance for this sort of risk. Otherwise the decision to "go bare" was not made by Olin; it was imposed on Olin by the marketplace.

The question therefore is whether insurance was generally available to cover the risk of gradual pollution. The district court found that it was. *See Olin II*, 986 F.Supp. at 844. A new type of insurance was introduced to the marketplace to fill the void created by the unavailability of CGL policies without pollution exclusion clauses: "environmental impairment liability" ("EIL") insurance. There appears to be no dispute that EIL insurance would have provided coverage similar to Olin's CGL policies with INA for the year in which the CGL pollution exclusion clauses were in effect. The district court also found that EIL coverage was available to large companies in the United States beginning at least as early as 1980. *See id.* Ten years had by then elapsed since the pollution exclusion clauses had been added to CGL policies. But EIL policies were sold on a "claims made" rather than an "occurrence" basis. Thus, had Olin bought such a policy sometime between 1980, when they became available, and 1985, when the pollution at the Williamston site

was discovered, liability for accidental environmental damage that occurred even before the purchase of EIL insurance would have been covered. The court further found that because Olin had failed to obtain an EIL policy, it should be held responsible for injury during the periods that it went uninsured. *See id.* at 845.

Olin first argues that the availability of EIL insurance is beside the point because once pollution exclusion clauses were regularly included in CGL policies, CGL insurance for that risk was unavailable. We disagree. In *Stonewall* we stated that "proration [to the insured] is appropriate as to years in which [the insured] elected not to purchase insurance or purchased insufficient insurance." *Stonewall*, 73 F.3d at 1203. We did not suggest that the relevant inquiry was limited to whether an insured was able to continue obtaining coverage for the particular risk in the same policy type, without an exclusion. If coverage under one type of policy becomes unavailable by exclusion, and the insurance customer can but does not buy the excluded coverage separately or in another policy type, it follows that the customer has opted to self-insure.

Olin also continues to take the position asserted in the district court that even if the availability of EIL insurance is relevant, availability alone does not determine whether Olin self-insured. The question, according to Olin, is whether it *elected* not to purchase EIL insurance. Olin engaged in a substantial effort to establish in the district court that it had made no such election. The court found that there was conflicting evidence as to the extent of Olin's efforts to acquire such coverage; whether Olin had applied to and been rejected by one EIL insurance company; whether that insurer went out of business at a time when Olin was applying to it; and whether Olin may have moved too slowly when dealing with that insurer. *See Olin II*, 986 F.Supp. at 844. The district court concluded, however, that it was sufficient to find that "EIL insurance

was available to companies like Olin in the marketplace beginning at least in 1980" and that "Olin did not obtain such insurance." *Id.* at 844. According to the court, Olin therefore assumed the risk for injuries that occurred during uninsured periods. *See id.* We agree with the district court that its findings as to the general availability of insurance that would have covered the risk at issue here and Olin's failure to obtain it were all that was necessary to allocate the uninsured years to Olin. There was no need to analyze whether Olin subjectively elected to forego insurance and self-insure.

*Stonewall*, we think, stands for that proposition. While the opinion does use the term "elected," the touchstone of our analysis was availability, not election. *See Stonewall*, 73 F.3d at 1204 (referring to district court's application of proration "to years when asbestos liability insurance was no longer available"). And we said that "periods of no insurance reflect a decision by an actor to assume or retain a risk" when it "is reasonable" to "expect the risk-bearer to share in the allocation," comparing such periods "to periods when coverage for a risk is *not available.*" *Id.* at 1203 (emphasis added and internal quotation marks omitted) (quoting *Owens–Illinois*, 138 N.J. at 479, 650 A.2d at 995).

We think this to be the better rule. First, the inquiry as to whether there is insurance generally available, as opposed to the inquiry whether a person or entity "elected" to purchase it, is objective and therefore more amenable to determination by a court than is the question of whether, subjectively, a knowing election was made. The extensive but inconclusive proceedings in the district court on this issue suggest as much. Second, focusing on availability rather than election removes from those assessing risk the impetus to create a record to establish that they never made such an election. The attempt to create that sort of record could well be at odds with a good faith effort to determine whether insurance coverage of the risk is available in

the marketplace. Third, making the issue whether coverage is available rather than whether it has been rejected places the incentives where they ought to be, requiring those assessing risks to use their best efforts to find out whether there is appropriate insurance in the marketplace, rather than encouraging them to maintain a maximum state of ignorance in order to avoid a later finding that they had "elected" not to purchase insurance.

■ As to the mechanics of allocating, *Stonewall* tells us that to determine the amount that an insurer must indemnify, one multiplies the insured's total liability by a fraction. That fraction "has as its denominator the number of years in which both injury-in-fact was occurring and insurance was available, and as its numerator the number of years within that period when the insurance was in effect." *Stonewall*, 73 F.3d at 1204. We have concluded that for all periods during which the jury found injury-in-fact to have occurred at the Williamston property, insurance was available to Olin. For Olin's groundwater liability, there were twenty-eight years of injury. INA provided coverage during thirteen of those years. The numerator of the *Stonewall* fraction is thus thirteen and the denominator twenty-eight. Ignoring deductibles for the moment, INA is therefore liable in the amount of thirteen twenty-eighths multiplied by Olin's total liability with respect to groundwater [$362,656] = $168,376. That amount equally allocated among the thirteen insurance policies for the thirteen covered years is $12,952 each.

■ Applying the *Stonewall* formula to Olin's liability with respect to soil, again ignoring deductibles, are attributable to thirty-five years of injury-in-fact. INA provided coverage for only two of those

years, 1956 and 1957. The numerator of the *Stonewall* fraction is therefore two and the denominator thirty-five. INA was thus liable in the amount of two thirty-fifths multiplied by Olin's total liability with respect to soil [$3,697,699] = $211,296.87. That amount allocated equally to the two triggered insurance policies is $105,648.44 each. *See* table, at p. [18] above, summarizing the results of the allocation.

We therefore agree with the result of the district court's allocation and affirm its judgment with respect to that issue.

### C. Applicability of Deductible

■ The district court applied a new deductible to each annual INA policy that was triggered. As a result, after damages were prorated and allocated to each year, Olin was entitled to coverage in a given year only if the amount of covered liability allocated to that year exceeded the $100,000 deductible. Olin argues that the district court erred by applying the $100,000 deductible to the amount allocated to each year. Olin asserts that because the liability has been prorated over the triggered years, the $100,000 deductible should be prorated too. Again, we disagree.

Insurance policies are premised on an allocation of risk between the insured and the insurer. For any given occurrence, the policies Olin had with INA allocated the first $100,000 of risk to Olin, the next $200,000 to INA, and any amount thereabove to Olin. By prorating the deductible but not the maximum per-occurrence coverage, Olin would upset this balance.[4] The initial $100,000 of risk to be picked up by Olin would be spread over a period of time; the $200,000 of risk to be covered by INA each year would not be. For instance, in

---

4. Olin has maintained throughout this litigation that the deductible from a single policy should be prorated, but has not similarly asserted that the maximum per-occurrence coverage should also be prorated. They have not told us what the effect of prorating the maximum per-occurrence coverage would have on proration of the deductible nor how a court would perform such a proration. These issues not having been raised, we do not address them.

the aggregate, for the period 1958 through 1970, the time over which liability for damages for groundwater injury was spread and INA provided coverage, the risk allocation would reflect a single $100,000 deductible to Olin, then *$3.8 million* to INA (the maximum per occurrence coverage [$300,000] multiplied by the thirteen policy-years triggered by a covered injury [= $3.9 million] less the $100,000 deductible [= $3.8 million]), and only then would the risk for any excess liability return to Olin.[5] This is not the coverage for which Olin bargained.

■ We therefore hold what *In re Prudential Lines* assumed, that when multiple policies are triggered and liability is allocated to each, each policy's deductible is applicable. *See* 158 F.3d at 86. It was precisely this multiplication of deductibles that we found to be a factor in declining to allocate there.

We do not find the cases upon which Olin relies persuasive. There is no indication in those decisions of the propriety of, nor did those courts address, prorating a deductible where the insured claims it is entitled to indemnification of the per occurrence policy maximum from each triggered policy, the issue here. *See, e.g., PECO Energy Co. v. Boden,* 64 F.3d 852, 857 (3d Cir.1995) (applying Pennsylvania law and finding that only a percentage of the per occurrence deductible applies where only portion of occurrence's loss occurred in a given policy year, but not addressing per occurrence maximum coverage, because coverage was provided on an "all risks" and not "occurrence" basis); *Lafarge Corp. v. Hartford Cas. Ins. Co.,* 61 F.3d 389, 401 (5th Cir.1995) (applying Texas law and affirming district court's apportionment of deductible where insurer's duty to indemnify defense costs were apportioned, but not addressing applicable

amount of maximum per occurrence coverage).

### D. Waiver of Notice Defense

■ INA has maintained that Olin forfeited insurance coverage it had under INA policies by failing properly to notify INA of Olin's claims. In response, Olin included in its amended complaint a claim for a declaration that INA disclaimed its obligation to indemnify Olin for liability for property damage. Olin asserts that it was thereby relieved of the obligation to notify INA of its alleged liability pursuant to the familiar principle that an insurer's repudiation of coverage on the ground that a loss is not covered operates as a waiver of any notice requirement contained in the policy. *See H.S. Equities, Inc. v. Hartford Accident & Indem. Co.,* 661 F.2d 264, 270 (2d Cir.1981).

The district court resolved this claim in its Rule 54(b) judgment. It concluded that INA had not issued a blanket or categorical denial of coverage to Olin and therefore had not waived notice of claim rights.

The determination of whether there was a categorical denial of liability by the insurer is a question of fact. *See Texaco A/S (Denmark) v. Commercial Ins. Co.,* 160 F.3d 124, 129–30 (2d Cir.1998). We therefore review the district court's determination for clear error. *See International Star Class Yacht Racing Ass'n,* 80 F.3d at 753.

Olin's assertion is based principally on INA's June 7, 1984 counterclaim in its answer to Olin's amended complaint. INA pleaded:

> 168. Olin has purported to send INA a number of other pollution claims, which involve the same or substantially the same coverage issue involved in this action.

> there is no year in which Olin incurred liability for which it was entitled to indemnification from INA for both soil and groundwater injury.

**5.** We need not address whether the liability for soil and groundwater damage allocated to a single policy year could be aggregated to meet an annual policy's deductible because

169. A controversy exists between INA and Olin with respect to these other pollution claims.

170. INA requests and is entitled to a declaration of Olin's and INA's duties and obligations, or lack thereof, with respect to such other pollution claims.

■ Once again we agree with the reasoning and conclusion of the district court, *see Olin I,* 972 F.Supp. at 202–03, and hold that its findings were not clearly erroneous. Under the rule of *H.S. Equities,* where an insured becomes aware of a general practice of its insurer to deny coverage for a particular type of claim on a particular basis, the insured is relieved of the obligation to continue to give futile notification as to such claims. *See HS Equities, Inc. v. Hartford Accident & Indem. Co.,* 609 F.2d 669, 673 (2d Cir.1979); *see also H.S. Equities,* 661 F.2d at 271. In the instant case, by contrast, even after what Olin claims was a blanket denial in June 1984, Olin continued to provide INA with notice of its claims and INA continued to negotiate with Olin with respect to Olin's various claims relating to environmental liability. INA's pleading to which Olin points was apparently designed by INA to preserve all claims and defenses that would otherwise have been available to it. As the district court concluded, INA never categorically denied that it had a duty to provide indemnification and therefore did not thereby waive notice.

## CONCLUSION

For the foregoing reasons, the district court's judgment entered pursuant to Federal Rule of Civil Procedure 54(b) is affirmed.